UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARK AHLQUIST, as next friend,
parent and guardian of J – A – ,
a minor
                    v.                                      C.A. No. 11- 138 -L
CITY OF CRANSTON, by and through
Robert F. Strom, in his capacity as
Director of Finance, and by and
through the SCHOOL COMMITTEE
OF THE CITY OF CRANSTON

**Plaintiff's Motion for Preliminary Injunction**

Plaintiff Mark Ahlquist, as next friend, parent and guardian of J – A – , a minor, by

undersigned counsel, hereby moves the Court, pursuant to Rule 65, F.R.Cv.P., for an order

preliminarily enjoining defendant City of Cranston from displaying the "School Prayer" painted

on the wall of the auditorium at Cranston High School West or allowing it to be viewed at any

time that school children are in attendance at Cranston High School West, pending a final

determination of the merits, on the ground that the School Prayer display in Cranston High

School West, a public high school operated by the City of Cranston through the Cranston School

Committee, violates Plaintiff's rights under the Establishment Clause of the First Amendment to

the United States Constitution, as applied to the states by the Fourteenth Amendment to the

Constitution, and 42 U.S.C. § 1983.

In support of the motion, Plaintiff submits a supporting memorandum of law and Exhibits

1-5, including Minutes of the School Committee of the City of Cranston and a subcommittee

thereof (Ex. 1-4), and the Affidavit of J—A—(Ex. 5).

Plaintiff further seeks an evidentiary hearing to present such additional facts, if any, as

are in dispute.

By Plaintiff's Attorneys,

  /s/ Lynette Labinger
Lynette Labinger  #1645
Roney & Labinger LLP
 Cooperating Counsel,
Rhode Island Affiliate,
American Civil Liberties Union
344 Wickenden Street
Providence, RI 02903
labinger@roney-labinger.com
(401) 421-9794
(401) 421-0132 (fax)

 /s/ Thomas R. Bender
Thomas R. Bender #2799
Hanson Curran LLP
 Cooperating Counsel,
Rhode Island Affiliate,
American Civil Liberties Union
One Turks Head Place Suite 550
Providence, RI 02903
trb@hansoncurran.com
(401) 421-2154
(401) 521-7040 (fax)

## Certificate of Service

I hereby certify that on May 25, 2011, a true copy of the foregoing document, supporting memorandum of law, and exhibits were served upon each attorney of record listed below by electronic filing of this document with the United States District Court for the District of Rhode Island:

Joseph V. Cavanagh, Jr.     Joseph V. Cavanagh, III
Blish & Cavanagh LLP      Blish & Cavanagh LLP
30 Exchange Terrace      30 Exchange Terrace
Providence, RI 02903-1765    Providence, RI 02903-1765
jvc@blishcavlaw.com      jvc3@blishcavlaw.com

  /s/ Lynette Labinger

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARK AHLQUIST, as next friend,
parent and guardian of J – A –,
a minor

    v.            C.A. No. 11- 138 -L

CITY OF CRANSTON, by and through
Robert F. Strom, in his capacity as
Director of Finance, and by and
through the SCHOOL COMMITTEE
OF THE CITY OF CRANSTON

**Plaintiff's Memorandum of Law
in Support of Motion for Preliminary Injunction**

Plaintiff,
By Plaintiff's Attorneys,

Thomas R. Bender,  #2799
Hanson Curran LLP
  Cooperating Counsel,
Rhode Island Affiliate,
American Civil Liberties Union
One Turks Head Place, Suite 550
Providence, RI 02903
trb@hansoncurran.com
(401) 421-2154
(401) 521-7040 (fax)

Lynette Labinger,  #1645
Roney & Labinger LLP
  Cooperating Counsel,
Rhode Island Affiliate,
American Civil Liberties Union
344 Wickenden Street
Providence, RI 02903
labinger@roney-labinger.com
(401) 421-9794
(401) 421-0132 (fax)

Table of Contents

Page

Introduction...................................................................................................1

Statement of the Case.....................................................................................2

Argument .......................................................................................................6

    I.)     Preliminary Injunction Standard....................................................6

    II.)    Substantial Likelihood of Success on the Merits.........................7

         A.)    The Establishment Clause embodies a principle of
                  government neutrality towards religion to promote liberty
                  of conscience, to protect against societal divisiveness, and to
                  promote tolerance of diverse religious views ...............................7

         B.)    The public school environment requires a heightened
                  sense of the neutrality required by the Establishment
                  Clause, and its vigilant enforcement by courts. ...........................15

               1.)    Public schools are important to the maintenance
                        of a democratic pluralistic society .....................................15

               2.)    Parents have a fundamental interest in guiding the
                        religious future and education of their children,
                        even where they have a minority view ..............................17

               3.)    Subtle coercive pressures exist in primary and
                        secondary schools that do not exist in other
                        public places.....................................................................18

               4.)    Establishment Clause analysis has yielded different
                        results for the same government conduct depending
                        on whether it occurs in a public school or some
                        other public location, and has consistently invalidated
                        overt and implied government endorsement of
                        religion in public schools..................................................20

         C.)    Both the purpose and effect of the "School Prayer" display
                    are to convey the school officials' endorsement of religion
                      and the religious practice of prayer................................22

1.)     *Lemon's* "purpose" and "effect" tests, as refined by endorsement analysis, govern the constitutionality of the "School Prayer" display ............... 22

2.)     The School Officials' decision to display a "School Prayer" was for the predominant purpose of endorsing religion and the religious practice of prayer ............................................................. 25

3)     Cranston's display of a "School Prayer" has the effect of conveying a message of official endorsement of religion and the religious practice of prayer ................................................ 30

III.)     Irreparable Injury ...................................................................................... 34

IV.)     Balance of Hardships and the Public Interest ....................................... 35

Conclusion ............................................................................................................ 36

## Introduction

This action is brought by Mark Ahlquist on behalf of his minor child, J—A--, a sophomore at Cranston High School West. For simplicity of reference, we refer to J—A—as "Plaintiff." Cranston High School West ("Cranston West") is a public high school (grades 9 through 12) operated by the City of Cranston, through the Cranston School Committee. The principal decision makers on behalf of the City—at least for current events—are the members of the Cranston School Committee. For simplicity of reference, we refer to the defendant either as "Cranston" or "the School Committee."

Plaintiff objects to Cranston's installation and maintenance of a religious prayer in the auditorium of Cranston West as a violation of her constitutional rights as protected by the Establishment Clause of the First Amendment to the United States Constitution.

The principle at the center of the Establishment Clause is that government must remain neutral with respect to religion and religious practices, religion being a very personal matter of individual conscience. With respect to the preservation and transmission of particular religious beliefs and traditions to minors of primary and secondary school age, Establishment Clause jurisprudence reserves that right and responsibility for the family, and the particular religious community they may embrace. As a consequence of a parent's fundamental interest and right in the raising of his or her children, the principle of neutrality has been applied with great sensitivity and vigilance in the public school context, and the Supreme Court "has made clear that a state is prohibited from sponsoring prayer in its elementary and secondary schools[,]" *Mellon v. Bunting*, 327 F.3d 355, 366 (4th Cir. 2003), because the Establishment Clause "is abridged when the State affirmatively sponsors the particular religious practice of prayer." *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 313 (2000).

The Plaintiff's Establishment Clause claim before the Court is centered on the prominent display of an expressly denominated "School Prayer" to "Our Heavenly Father" permanently affixed on the wall of the auditorium of Cranston High School West. The prayer, composed by a student and adopted as the "official prayer" of Cranston West in its early days, was then painted on the auditorium wall in the form of a large banner in the early 1960s and has been maintained by Cranston to this day. When Plaintiff, a student at Cranston West and a self-described atheist, and others objected to the display, Cranston, through its School Committee, in March 2011 (after months of consideration), affirmatively confirmed Cranston's continuing decision to maintain the prayer in the auditorium.

Plaintiff seeks a preliminary injunction directing Cranston to cover the School Prayer until a final decision on the merits. Plaintiff submits that both the purpose and effect of Cranston's installation and maintenance of the "School Prayer" are to endorse and affirm religious belief and religious practice of prayer in violation of the Establishment Clause, as integral to being a good student-citizen at Cranston West.

## Statement of the Case[1]

### *Creation of a School Prayer for Cranston High School West*

Cranston High School West opened in approximately 1958 as a combined junior and senior high school (8/16/10 Min. at 792, School Superintendent Nero). About two years after

---

[1]    Plaintiff seeks an evidentiary hearing on all disputed issues. Plaintiff has submitted her affidavit, in support of her motion, and relies upon the allegations of her complaint, which she has verified (Aff. of J--A--¶3), and minutes of the School Committee and of the special subcommittee convened to study the issues presented herein. The minutes have been appended as Exhibits with student names redacted. References to the minutes are provided by date of meeting and page number as provided in the minutes. Minutes of the School Committee may also be accessed at the School Committee's website, http://cpsed.net/schcom/minutes/sept09.pdf.

the school opened, a member of the student council was tasked by school administrators to write

a school prayer and school creed.[2]  (3/7/11 Min. at 61, David Bradley).  Before the School Prayer

was developed, students at Cranston West recited the Lord's Prayer.[3]  (*Id.*)  Once approved, the

students recited the School Prayer in place of the Lord's Prayer as part of their morning

exercises.  (*Id.*; Complaint ¶¶15-23)

When the school auditorium was built in the early 1960s, both the School Prayer and the

School Creed were painted onto its walls in the style of large banners.  The School Prayer was

recited at group events.  (3/7/11 Min. at 76, Nero; Complaint ¶¶7-8, 15-24 and Ex. 1-2).

The "School Prayer," a large and prominent display in the auditorium of Cranston West

(Complaint, Ex. 1), reads as follows:

---

[2] Other students were asked to choose school colors and a school mascot. (3/7/11, Min. at 61, Bradley).

[3] The students were led each day in a recitation of the Catholic version of the "Our Father," also commonly referred to as the "Lord's Prayer," the prayer taught by Jesus to his disciples. *The American Heritage Dictionary of the English Language* 1033 (4th ed. 2006).

The "Our Father" epitomizes "the spirit of Christian Prayer and a formula to be employed in worship[,]" 2 *The Encyclopedia of Religion*, Eliade 26 (1987) (citing *Luke* 11:2-4), and is the "fundamental Christian prayer" of the Catholic Church. *Catechism of the Catholic Church*, 2759 (1994).  The Lord's Prayer recited in the Catholic liturgy originates from the New Testament Gospel of *Matthew* 6:9-13:

> **OUR FATHER WHO ART IN HEAVEN,**
> hallowed be thy name.
> Thy kingdom come,
> Thy will be done on earth,
> as it is in heaven.
> Give us this day our daily bread,
> and forgive us our trespasses,
> as we forgive those who trespass
> against us,
> and lead us not into temptation,
> but deliver us from evil.

SCHOOL PRAYER

OUR HEAVENLY FATHER

GRANT US EACH DAY THE DESIRE TO DO OUR BEST, TO GROW MENTALLY AND MORALLY AS WELL AS PHYSICALLY, TO BE KIND AND HELPFUL TO OUR CLASSMATES AND TEACHERS, TO BE HONEST WITH OURSELVES AS WELL AS WITH OTHERS, HELP US TO BE GOOD SPORTS AND SMILE WHEN WE LOSE AS WELL AS WHEN WE WIN, TEACH US THE VALUE OF TRUE FRIENDSHIP, HELP US TO ALWAYS CONDUCT OURSELVES SO AS TO BRING CREDIT TO CRANSTON HIGH SCHOOL WEST.

AMEN

The School Prayer is a series of petitions to "Our Heavenly Father" – "grant us, help us, teach us" – expressed by the students of Cranston High School West.

At some point, the practice of reciting the School Prayer on a daily basis or for group events in the auditorium was discontinued, but the display remained.  The auditorium is used by students for both mandatory and extra-curricular programs throughout the school year. (Complaint ¶¶ 29-31; Affidavit of J—A--¶¶12, 19)

### *The School Prayer Display and Plaintiff's Complaint*

In July 2010, the Rhode Island Affiliate of the American Civil Liberties Union ("ACLU") alerted the Superintendent of Cranston Public Schools of a complaint about the display of the School Prayer at Cranston West, which the School Committee considered as notice of intention to bring legal action if the Prayer display were not removed (8/16/10 Min. at 792, Nero; 2/22/11 Min. at 1) or reworded in a way to remove its religious content (2/22/11 Min. at 5).

The School Committee met on a number of occasions and convened a subcommittee to consider Cranston's position on the continued maintenance of the Prayer:  should it remove or alter the Prayer as sought or resolve to defend against the anticipated law suit?  The Committee

and the subcommittee received comments from the public, as well as petitions, concerning the continued installation and display of the Prayer.  On March 7, 2011 the full School Committee held a public hearing to consider the subcommittee's recommendation of February 22, 2011, that Cranston defend the continued display of the School Prayer in the auditorium against the anticipated law suit.  (3/7/11 Min. at 75)  After a lengthy public hearing with numerous witnesses, and statements by each committee member as how they would vote and why, the resolution passed 4 to 3.  (*Id.* at 86).  The School Prayer would remain.

The School Prayer is painted on the wall to the right of the auditorium stage, at the front of the auditorium adjacent to the first two rows of seats.  (Complaint Ex. 2).  The School Creed is painted on the wall to the left of the auditorium stage, across from the School Prayer. (Complaint ¶ 22; Affidavit of J—A-- ¶¶14-18 and Ex. A-B thereto)

Although the Prayer and the Creed are painted in a style to look like a banner, they are an integral part of the auditorium wall.  Affixed to the walls are actual cloth banners that identify various graduating classes from the 1980s, 1990s, and 2000s, as well as a sculpture of a falcon – the school mascot – immediately to the right of the creed, with a small plaque, "Class of 1964," just below it.  (Affidavit of J—A-- ¶¶14-18 and Ex. A-B thereto)

Plaintiff is a sophomore at Cranston West.  She is an atheist.  She objects to the school sanctioned display of the "School Prayer" in her high school auditorium.  Whenever she is required to attend an assembly in the auditorium, or when she chooses to attend extracurricular events, she is exposed to this prominent and large display.  She has felt isolated, ostracized and devalued by her school and community because of the School Prayer.  She seeks its removal from the school auditorium.  Plaintiff will be returning to school in fall 2011 as a junior.  She

seeks a preliminary injunction enjoining the display of the "School Prayer" pending decision on the merits.  (Affidavit of J—A-- ¶22 )

## Argument

### I.)    Preliminary Injunction Standard

To obtain a preliminary injunction, Plaintiff must demonstrate:  1) she has "a substantial likelihood of success on the merits" of her claim of an Establishment Clause violation; 2) there is "a significant risk of irreparable harm" absent an injunction; 3) the balance of hardships as between Plaintiff and Cranston tips in her favor; and 4) the injunction will not harm the public interest.  *Bennett v. Mollis*, 590 F.Supp.2d 273, 277 (D.R.I. 2008) (citing *Wine & Spirit Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005)); *accord, McGuire v. Reilly*, 260 F.3d 36, 47 (1st Cir. 2001).

Not all four components are weighed equally. The first factor – "a substantial likelihood of success on the merits" – is usually weighed more heavily. *Waldron v. George Weston Bakeries, Inc.*, 570 F.3d 5, 9 (1st Cir. 2009).  In the great majority of cases, it constitutes the focal point of the inquiry and *sine qua non* of preliminary injunctive relief.  *McGuire*, 260 F.3d at 51.

That *sine qua non* exists here.   As Plaintiff will demonstrate, the touchstone of Establishment Clause analysis is the general principle of government neutrality both as between distinct religions, and as between religion and nonreligion.  *See McCreary County, Kentucky v. ACLU*, 545 U.S. 844, 860 (2005).   Moreover, Establishment Clause principles require a heightened sensitivity for, and vigilant enforcement of, the principle of neutrality in the constitutionally special context of public primary and secondary schools such as Cranston West. *See Lee v. Weisman*, 505 U.S. 577, 592 (1992); *Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (plurality opinion).  As a consequence, over the decades since 1962, the Court's Establishment

Clause jurisprudence "has been remarkably consistent in sustaining virtually every challenge to government-sponsored religious expression or involvement in the public schools." *Coles v. Cleveland Bd. of Education*, 171 F.3d 369, 377 (6th Cir. 1999).

Both Cranston's original decision to prominently display a "School Prayer" to "Our Heavenly Father" in the auditorium of one of its high schools, and its immediate decision to continue that display, violate the core Establishment Clause principle of government neutrality towards religion in public schools. Both the purpose and effect of the display are to endorse government favor for belief in heaven, God and the religious practice of prayer at Cranston High School West. Preliminary injunctive relief is warranted.

**II.) Substantial Likelihood of Success on the Merits.**

    **A.) The Establishment Clause embodies a principle of government neutrality towards religion to promote liberty of conscience, to protect against societal divisiveness, and to promote tolerance of diverse religious views.**

Three opinions issued on the same day in 2005 in *McCreary* and *Van Orden, supra*, two cases involving the display of the Ten Commandments on public property, describe the long-standing majority view of the "touchstone" that underlies the First Amendment's Establishment Clause: "government neutrality between religion and religion, and between religion and nonreligion." *McCreary*, 545 U.S. at 580 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1963)).[4]

---

[4] Originally applicable only as to the Federal government, the Establishment Clause has been incorporated through the Fourteenth Amendment to also apply to State governments, *Freedom From Religion Foundation v. Hanover School District*, 626 F.3d 1, 6-7 (1st Cir. 2010) (hereinafter "*Freedom*"). The decision and actions of municipal school officials and school boards are considered choices "attributable to the State." *Lee*, 505 U.S. at 587. In Rhode Island the General Assembly has the ultimate responsibility under the state constitution to "promote public schools * * * and to adopt all means which it deems necessary and proper to secure to the people the advantages and opportunities of education * * *." *Town of Johnston v. Santilli*, 892 A.2d 123, 128 (R.I. 2006) (quoting R.I. Const. Art. 12, sec. 1). The General Assembly "long

By a 5-4 decision, *McCreary* invalidated the public display of the Ten Commandments on the inside walls of a county courthouse. 545 U.S. at 881. In *Van Orden*, a different 5-4 majority held that the public display of the Ten Commandments on a monument in the 22-acre Texas state capitol grounds did not violate the Establishment Clause. 545 U.S. at 692. Justice Breyer provided the difference in *Van Orden*, joining the four *McCreary* dissenters in the *Van Orden* judgment, but not in their plurality opinion. 545 U.S. at 698.

Justice Breyer, however, had joined Justice Souter's majority opinion in *McCreary*, which was also joined by Justice O'Connor with a separate concurring opinion. 545 U.S. at 849. Justice Breyer's *Van Orden* concurrence did not "agree with the plurality's analysis," but instead stated his agreement with Justice O'Connor's "statement of principles" in *McCreary*, 545 U.S. at 704-05, thus forming a majority of the Court that continued to hold that, at its core, the Establishment Clause requires government neutrality "between religion and religion, and between religion and nonreligion." 545 U.S. at 850.

The governing principle of neutrality serves to promote three essential constitutional goals. First and foremost, the Establishment Clause stands for the liberty and freedom of individual conscience, in the highly personal matter of religious faith and belief, unencumbered by the interference or influence of government. "[T]he religion clauses were designed to safeguard the freedom of conscience and belief . . . They embody an idea that was once considered radical: Free people are entitled to free and diverse thoughts, which government

---

ago chose to delegate much of that constitutionally based responsibility to the school committees of the several cities and towns[,]" 892 A.2d at 134 (Robinson, J., dissenting); *see also* 892 A.2d at 128, and School Committees act as the State's agent insofar as they implement the General Assembly's educational responsibility. *Cummings v. Godin*, 119 R.I. 325, 330, 377 A.2d 1071, 1073 (1977). For purposes of suit, however, a school department is still a municipal department, and like any other suit against a municipal department, the proper party defendant is the municipality itself. *See, e.g., Peters v. Jim Waller Door Sales of Tampa, Inc.*, 525 A.2d 46, 47 (1987).

ought not to constrain nor to direct[.]" *McCreary*, 545 U.S. at 881-82 (O'Connor, J., concurring); *accord*, *McCreary*, 545 U.S. at 876 ("The Framers and the citizens of their time intended . . . to protect individual conscience in religious matters[.]") (citation omitted); *Van Orden*, 545 U.S. at 705 (Breyer, J., concurring in the judgment) (the Religion Clauses "seek to 'assure the fullest possible scope of religious liberty and tolerance for all.'") (quoting *School District of Abington Tp. v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J., Harlan, J., concurring)).

The First Amendment's concern with "liberty of conscience" reflects a constitutional design envisioning that "the preservation and transmission of religious beliefs" is a "responsibility and choice committed to the private sphere[,]" and not the responsibility or choice of government. *See Lee v. Weisman*, 505 U.S. at 589. Thus under the Establishment Clause, the preservation and transmission of religious belief and tradition is accomplished in "reliance on home, the church and the inviolable citadel of the individual heart and mind." *Schempp*, 374 U.S. at 226. It is not the responsibility or prerogative of local school officials and schools. The limitations on government embodied by the Establishment Clause serve to preserve a private sphere of conscience in religious matters, in order to further "religious liberty to the fullest extent possible" in an increasingly pluralistic society. *Id.*

But the Establishment Clause also "stands as an expression of principle on the part of the Founders that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Engel v. Vitale*, 370 U.S. 421, 431-32 (1962) (quoting *Memorial and Remonstrance Against Religious Assessment*, II Writings of Madison 183, 187). The Clause recognizes that it is not within the business or competence of civil authorities to interfere in, or direct, religious matters. 370 U.S. at 434 n. 20 (quoting Roger Williams, "what imprudence and

indiscretion is it in the most common affaires of Life, to conceive that Emperours, Kings and
Rulers of the earth must not only be qualified with politicall and state abilities to make and
execute such Civille Lawes which may concerne the common rights, peace and safety (which is
worke and businesse, load and burthen enough for the ablest shoulders in the Commonweal) but
also furnished with such Spirituall and heavenly abilities to governe the Spirituall and Christian
Commonweale * * * ”) (Williams, The Bloudy Tenent of Persecution, for cause of Conscience,
discussed in A Conference betweene Truth and Peace (London 1644), reprinted in Narragansett
Publications, Vol. III, p. 366).

Speaking to the School Committee, Rabbi Amy Levin, Vice President of the Rhode
Island Board of Rabbis, expressed the core of these principles very eloquently and succinctly:

> Any member of the clergy in Cranston welcomes the opportunity
> to deepen our teenagers' relationship with God and with the
> particular premises of our respective religious faiths. [But] I am
> not comfortable with this discussion passively or actively, taking
> place within our town[']s secular school[] system.
>
> *   *   *
>
> [C]are must be taken to insure that the language of that document
> be equally accessible to students who come from Catholic homes,
> from Protestant homes, from Jewish homes and from Atheistic
> homes as well.  We gather as people of faith or not by personal
> choice.

(8/16/10 Min. at 791)

The Establishment Clause principles preserve the individual freedom to explore and
determine, according to one's own conscience influenced by family, church, or one's own
experiences, whether religious tradition suits them, and if it does, which tradition suits them best.
It is not for public schools to endorse a religious path in general, or a particular religious path in
specific.  The path is chosen by the individual, influenced by family tradition and belief, and
spiritual teachers if the student chooses to seek them out, and not by public school officials.  And

"[i]t is neither sacrilegious nor antireligious to say that each government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." *Engel v. Vitale*, 370 U.S. at 435. Instead, it is quite the opposite. It is *respectful* of religion to give it a status as a personal, sacred sphere beyond the reach of civil elected officials to promote and teach.

Protecting religion from the local public official also serves to avoid the social conflict and divisiveness that arise when government appears to take sides in matters of religious conscience that are debated between differing, but deeply held, religious traditions, beliefs and practices -- "sapping the strength of government and religion alike." *Van Orden*, 545 U.S. at 705 (Breyer, J., concurring in the judgment) (citing *Zelmon v. Simmons-Harris*, 536 U.S. 639, 717-729 (2002) (Breyer, J., dissenting)). Just as religion can provide "spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects" that might dominate. *School District of City of Grand Rapids v. Ball*, 473 U.S. 373, 382 (1985), *overruled on other grounds, Agostini v. Felton*, 521 U.S. 203 (1977). Therefore the Religion Clauses operate to maintain a degree of "separation of church and state," a separation that is critical to the "peaceful dominion that religion exercises in [this] country," where the "spirit of religion" and the "spirit of freedom" may productively coexist and be "united," "reign[ing] together" but in separate spheres "on the same soil." 545 U.S. at 698 (Breyer, J., concurring in the judgment) (quoting A. de Tocqueville, *Democracy in America*, 282-283 (1855) (H. Mansfield & D. Winthrop transl. and eds. 2002)).

While the Establishment Clause was written over two centuries ago, the Court's recent observation in *McCreary* that, "the divisiveness of religion in *current* public life is

inescapable[,]" 545 U.S. at 881 (emphasis added), can hardly be denied. The religious beliefs of our Nation's citizens are significantly more pluralistic today than they were at the time of our Nation's founding, and consequently, avoiding religiously based social conflict is a significant concern. *See Zelmon v. Simmons-Harris*, 536 U.S. 639, 723 (2002) (Breyer, J., with whom Stevens, J., and Souter, J., join, dissenting).

> America boasts more than 55 different religious groups and subgroups with a significant number of members. *Graduate Center of the City University of New York, B. Kosmin, E. Mayer, & A. Keysar, American Religious Identification Survey 12-13* (2001). Major religions include, among others, Protestants, Catholics, Jews, Muslims, Buddhists, Hindus, and Sikhs. *Ibid.* And several of these major religions contain different subsidiary sects with different religious beliefs. *See* Lester, *Oh Gods!* The Atlantic Monthly 37 (Feb. 2002). Newer Christian immigrant groups are "expressing their Christianity in language, customs, and independent churches that are barely recognizable, and often controversial, for European-ancestry Catholics and Protestants." H. Ebaugh & J. Chafetz, *Religion and New Immigrants: Continuities and Adaptations in Immigrant Congregations* 4 (abridged student ed. 2002).

*Id.* at 723. And that says nothing of the Americans whose conscience cannot bring them to believe in God, sometimes seemingly the most controversial choice of conscience of all, but whose conscience still brings them to lead good, decent, value-filled lives.

The concern with the potential for divisiveness that arises when government appears to align itself with religion, or an identifiable religious view, is a particular concern in the Court's Establishment Clause jurisprudence concerning public schools. In *Engel v. Vitale*, *supra*, the Court held that the Establishment Clause forbids prayer in public schools, in part because the Court recognized the "anguish, hardship and bitter strife that could come when zealous religious groups struggle with one another to obtain the Government's stamp of approval . . ." *Id.* at 429. *See also Lee v. Weisman*, 505 U.S. at 588 (striking down school-sanctioned prayer at high

school graduation ceremony because "potential for divisiveness" has "particular relevance" in the school environment); *Schempp*, 374 U.S. at 307 (Goldberg, J., concurring) (Bible-reading program violated Establishment Clause in part because it gave rise "to those very divisive influences and inhibitions of freedom" that come with government efforts to impose religious influence on "young impressionable [school] children").

The Court has consistently recognized that in order to protect the liberty of individual conscience in religious matters; to free society of potential religious divisiveness; and to promote tolerance for divergent religious views, the solution adopted by the Establishment Clause Framers was to require "government to maintain a course of neutrality among religions, and between religion and nonreligion." *Ball*, 473 U.S. at 382. *See also McCreary,* 545 U.S. at 860 and at 884 (O'Connor, J. concurring) ("The Religion Clauses, . . . protect adherents of all religions, as well as those of no religion at all."). Indeed, even Justice Breyer's controlling opinion in *Van Orden* reiterated the fundamental principle of the Establishment Clause, that government must "effect no favoritism among sects or between religion and nonreligion, and . . . work no deterrence of no religious belief." 545 U.S. at 705 (quoting *Schempp*, 374 U.S. at 305 (Goldberg, J. with whom Harlan, J., joined, concurring)).

Establishment Clause neutrality demands "an attitude on the part of government that shows no partiality to any one group," *Zorach v. Clauson*, 343 U.S. 306, 313 (1952), and "expresses Madison's condemnation of 'employ[ing] Religion as an engine of civil policy[.]" *Van Orden*, 545 U.S. at 737 (Souter, J., with whom Stevens, J. and Ginsberg, J. join, dissenting) (quoting Memorial and Remonstrance Against Religious Assessments, 2 Writings of James Madison, 183, 187 (G. Hunt ed. 1901)). It prohibits government from promoting and endorsing religion over nonbelief, or promoting one religion over another, thereby making "adherence to

religion relevant to a person's standing in the political community." *McCreary*, 545 U.S. at 883 (O'Connor, J., concurring) (internal citations and quotations omitted).

The neutrality principle also reflects our Nation's constitutional view that "[m]anifesting a purpose to favor one faith over another, or adherence to religion generally, clashes with the "understanding, reached .  .  . after decades of religious war, that liberty and social stability *demand a religious tolerance that respects the views of all citizens*[.]" *McCreary*, 545 U.S. at 860 (quoting *Zelmon v. Simmons-Harris*, 536 U.S. at 718 (Breyer, J., dissenting)) (emphasis added). This tolerance extends beyond tolerance among different Christian sects and tolerance among different religions, to tolerance "of the disbeliever and the uncertain[,]" and requires "equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism." *Wallace v. Jaffree,* 472 U.S. 38, 53-54 (1985).

Compactly stated by the First Circuit: "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief[.]" *Freedom*, 626 A.2d at 10 (quoting *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 593-94 (1989)). The Clause reflects the notion that Americans do not need the assistance and endorsement of government to be a religious people, as their consciences will allow, but that Americans must, through the neutrality of their government, afford respect for the plurality of our neighbors' religions to be one Nation. And that is of particular constitutional importance in public school systems.

**B.)** **The public school environment requires a heightened sense of the neutrality required by the Establishment Clause, and its vigilant enforcement by courts.**

**1.)** **Public schools are important to the maintenance of a democratic pluralistic society.**

Apart from "government neutrality," a second principle deeply embedded in Establishment Clause jurisprudence is the principle requiring a particularly heightened sensitivity for the Establishment Clause in the context of primary and secondary schools. *Lee v. Weisman*, 505 U.S. at 592 ("As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressures in the elementary and secondary schools."); *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987) ("This Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools."); *see Doe v. Beaumont*, 240 F.3d 462, 487 (5th Cir. 2001) (noting that the Establishment Clause must be applied with "special sensitivity" in a public school setting). Even the four justices joining the plurality opinion in *Van Orden*, approving the display of the Ten Commandments on a monument on the Texas State Capitol grounds, all of whom dissented in *McCreary*, acknowledged the Court's "particularly vigilant" enforcement of the Establishment Clause in elementary and secondary schools. 545 U.S. at 691 (plurality opinion by Rehnquist, C.J., jointed by Scalia, J., Kennedy, J., and Thomas, J.) (quoting *Aguillard, supra*). Stated simply, "[i]n the Establishment Clause context, public schools are different[.]" *Freedom*, 626 F.3d at 8. There are several reasons why.

First is the recognition that public schools are "important to the maintenance of a democratic, pluralistic society." *Coles,* 171 F.3d at 377 (citing *People of Illinois ex rel. McCollum v. Board of Education of School Dist. No. 71*, 333 U.S. 203 (1948) (Frankfurter, J., concurring)). Public schools "are educating the young for citizenship[.]" *Jaffree*, 472 U.S. at 60

15

n. 51 (quoting *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943)).  In *McCollum*, Justice Frankfurter described the unique role of public schools as "perhaps the most powerful agency for promoting cohesion, among a heterogeneous democratic people," requiring them, as institutions, to "keep scrupulously free from entanglement in the strife of sects."  333 U.S. at 216-17.  Almost 40 years after Justice Frankfurter penned these words, the Court reiterated this idea as a governing principle: "[T]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny.  *In no activity of the state is it more vital to keep out divisive forces than its schools*." *Edwards v. Aguillard*, 482 U.S. at 583-84 (emphasis added).

But our public schools not only promote our common destiny as a democracy, they ought also to promote our common destiny as a *constitutional* democracy that protects and preserves certain individual rights enumerated in the Constitution.  "That they are educating the young for citizenship is reason for the scrupulous protection of Constitutional freedoms of the individual [under the Establishment Clause], if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Jaffree*, 472 U.S. at 60 n. 51 (quoting *Barnette*, 319 U.S. at 637). To be sure, this does not mean that the educational system must leave students "wholly ignorant of religious thought." *McCollum*, 333 U.S. at 236 (Jackson, J., concurring).  Schools may integrate religion into an educational curriculum or lesson on the "study of civilization, ethics, comparative religion or the like," *see Stone v. Graham*, 449 U.S. 39, 42 (1980), in order to advance the student's understanding of the religious pluralism that exists in the world and our Nation, and to promote tolerance for different religious traditions and practices.  But it is vital that government not abandon neutrality with respect to religion, and that government avoid the divisiveness engendered by appearing to

endorse, favor, or advance religion and religious practice over nonreligion, or one religion and its practices over another. Faithful adherence to these precepts ensures that government not only maintains a respect for important constitutional principles, but a respect for the family.

> **2.) Parents have a fundamental interest in guiding the religious future and education of their children, even when they have a minority view.**

The second reason "public schools are different" is the recognition of "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 231 (1972) (also at 233, referring to the "charter of the rights of parents to direct the religious upbringing of their children"); *see Doe v. Madison School Dist. No. 321*, 177 F.3d 789, 795 (9th Cir. 1999) ("Parents have a right to direct the religious upbringing of their children and, on that basis, have standing to protect their right.")

Parents "entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Edwards v. Aguillard*, 482 U.S. at 584; *see also Lee v. Weisman*, 505 U.S. at 643 (Scalia, J., joined by Rehnquist, C.J., White, J., and Thomas, J., dissenting) ("our school prayer cases turn in part on the fact that the classroom is inherently an instructional setting, and daily prayer there – where parents are not present to counter 'the student's emulation of teachers as role models and the children's susceptibility to peer pressure,' . . . – might be thought to raise special concerns regarding state interference with the liberty of parents to direct the religious upbringing of their children").

Parents have a fundamental liberty interest in preserving and transmitting their religious beliefs and traditions to their children, through their relationship with their children and the

churches, synagogues, mosques or other institutions of worship or teaching they choose, without the competing exertion of influence by local government officials.

### 3.) Subtle coercive pressures exist in primary and secondary schools that do not exist in other public places.

The third reason why "public schools are different" from other public institutions and locations is because of "subtle coercive pressures in the elementary and secondary schools[,]" *Lee v. Weisman*, 505 U.S. at 592, a constant theme throughout Establishment Clause jurisprudence. It is a familiar teaching of the Court that school sponsorship of a religious message sends an ancillary message to students who do not adhere to that religious message "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community[,]" *see, e.g., Santa Fe Independent School District v. Doe*, 530 U.S. 290, 309-10 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring), and the Court has long recognized that "the indirect coercive pressure upon religious minorities to conform . . . is plain[,]" in the public school context where attendance is mandatory and "non-conformity is not an outstanding characteristic of children." *Jaffree*, 472 U.S. at 60 n. 51 (internal quotations and citations omitted). That school officials do not "operate directly to coerce nonobserving individuals" "does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain." *Id.* (internal quotations and citations omitted).

"[W]hat to most believers may seem as nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the state to enforce a religious orthodoxy." *Santa Fe,* 530 U.S. at 312 (quoting *Lee*, 505 U.S. at 592). Through the conduct and policies of local school authorities the State can potentially exert "great authority and coercive power."

*Edwards*, 482 U.S. at 584. Even members of the Court advocating an Establishment Clause jurisprudence less restrictive on government than the current majority view recognize that "school prayer occurs within a framework in which legal coercion to attend school (*i.e.*, coercion under threat of penalty) provides the ultimate backdrop." *Lee*, 505 U.S. at 643 (Scalia, J., joined by Rehnquist, C.J., White, J., and Thomas, J., dissenting).

For elementary and secondary public school students, whose attendance at school is mandatory, the Court has long recognized the "special force" of the "indirect coercive pressure upon religious minorities to conform," when the prestige of government is placed behind a particular religious belief – whether it be a belief in God, numerous gods or no god, or a preference for one religion over another. *Jaffree*, 472 U.S. at 60, n. 51 (quoting *Engel*, 370 U.S. at 431). Public schools are an especially important venue for recognizing, implementing, and enforcing the importance of the governmental neutrality toward religion under the Establishment Clause, which embodies the understanding "that liberty and social stability demand a religious tolerance that respects the religious views of all citizens," including high school students, "to worship God in their own way," or not, and "allows families to 'teach their children and to form their character' as they wish[,]" without government sending the message that they are wrong. *Zelmon v. Simmons-Harris*, 536 U.S. at 718 (Breyer, J., with whom Stevens, J., and Souter, J., join, dissenting) (quoting C. Radcliffe, *The Law & Its Compass* 71 (1960)).

And the Court's "heightened sensitivity" for these considerations, and enforcement of the Establishment Clause's limitations on government in the context of primary and secondary schools, is reflected in its decisions.

**4.)**  **Establishment Clause analysis has yielded different results for the same government conduct depending on whether it occurs in a public school or some other public location, and has consistently invalidated overt and implied government endorsement of religion in public schools.**

Because "public schools are different," the Supreme Court's Establishment Clause analysis has at times yielded different results depending upon whether the challenged symbol or conduct occurred within a public school or in some other setting. *Compare Stone*, 449 U.S. at 42-43 (1980) (per curiam) (holding state law requiring Ten Commandments to be posted in every public school classroom violated Establishment Clause) with *Van Orden,* 545 U.S. at 681 (plurality opinion) (rejecting Establishment Clause challenge to Ten Commandments monument on 22-acre state capitol grounds); 545 U.S. at 703 (Breyer, J., concurring in the judgment) ("This display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state."); *compare also Lee*, 505 U.S. at 598-99 (holding prayer at secondary school graduation to be unconstitutional) with *Marsh v. Chambers*, 463 U.S. 783, 793-95 (1983) (upholding prayer in state legislature).

As a result of the special Establishment Clause concerns existing in the primary and secondary school context, for over 50 years the Court has consistently invalidated overt and implied messages of government endorsement of the religious activity of prayer, and the religious messages conveyed by religious symbols in public schools, messages directed by government to students. *See, e.g., Santa Fe*, 530 U.S. at 313 (invalidating school district policy permitting student-led, student-initiated invocations prior to football games); *Lee*, 505 U.S. at 596 (invalidating school-sanctioned clergy prayers at official graduation ceremonies); *Wallace*, 472 U.S. at 60-61 (invalidating Alabama statute authorizing daily period of silence for the suggested purpose of meditation or prayer, where prior statute authorized moment of silence with

no mention of prayer); *Stone*, 449 U.S. at 41 (invalidating Kentucky statute requiring the posting of a copy of the Ten Commandments in classrooms where they were not integrated into the curriculum and served no educational function); *Schempp*, 374 U.S. at 223 (invalidating recitation of the Lord's prayer or a Bible reading as part of a school's morning exercise); *Engel*, 370 U.S. at 436 (invalidating student recitation of prayer selected by State Board of Regents).

While the use of religious text, as part of a curriculum about different religions or cultures, comparative religion, history or ethics, may well be constitutional, *see Stone, supra,* at 42; *Epperson v. Arkansas,* 393 U.S. 97, 106 (1968) ("study of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition"), never has the Supreme Court held that the non-educational display of religious symbols or text in the public schools is constitutionally permissible. It has been a consistent position of the Court that even if schools "do not actually 'impos[e] pressure upon a student to participate in a religious activity[,]' " *Lee*, 505 U.S. at 604-05 (Blackmun, J., with whom Stevens, J., and O'Connor J., join, concurring) (quoting *Board of Ed. of Westside Community Schools, Dist. 66 v. Mergens*, 496 U.S. 226, 261 (1990) (Kennedy, J., concurring in part and concurring in judgment)), the Establishment Clause "proscribes public schools from 'conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred*[.]'" *Id.* (quoting *Allegheny*, 492 U.S. at 593 (internal quotation marks omitted; emphasis in original)).

The government-sanctioned permanent installation depicting a "School Prayer" for Cranston High School West students does precisely that – it conveys the message that religious belief and prayer to "Our Heavenly Father" are integral to achieving the aspirations the students are asked to live up to as members of the Cranston West community and tradition. It conveys

approval of the importance of religious belief and prayer, and the message that religious belief and prayer to "Our Heavenly Father" are, in the official school view, an important part of becoming a good Cranston West citizen-student.

Moreover, from any objective perspective, that is the purpose and effect of maintaining the School Prayer on the school auditorium wall.

**C.)  Both the purpose and effect of the "School Prayer" display are to convey the school officials' endorsement of religion and the religious practice of prayer.**

**1.)  *Lemon's* "purpose" and "effect" tests, as refined by endorsement analysis, govern the constitutionality of the "School Prayer" display.**

In reiterating that neutrality is the "touchstone" of First Amendment analysis, *McCreary*, 545 U.S. at 860, the Supreme Court also acknowledged Justice Harlan's observation that neutrality "is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation" by the First Amendment.  *Id.* at 876, (quoting *Sherbert v. Verner*, 374 U.S. 398, 422 (1963) (Harlan, J., dissenting)).  To guide a court's analysis in determining whether government has sufficiently deviated from the "channel" of neutrality to violate the Establishment Clause, the Court articulated a test in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), that has long governed Establishment Clause claims.

*Lemon* originally articulated a three factor test that was subsequently molded into a two factor inquiry. *See Agostini v. Felton,* 521 U.S. 203, 232-233 (1997).  The factors are:  first, whether the government acts with a secular or religious *purpose*, and second, whether the principle or primary *effect* of the government's act either advances or inhibits religion.  402 U.S. at 612-13.[5]

---

[5] The third factor articulated in *Lemon* was whether the government action fostered an "excessive entanglement with religion." *Id.* But in *Agostini* the Court folded the entanglement inquiry into the primary effect inquiry, reasoning that the factors used to assess whether an

"Purpose" and "effect" are examined from an "endorsement" perspective, an analysis described by Justice O'Connor in her concurrence in *Lynch,* 465 U.S. at 688, and adopted by a majority of the Court in *County of Allegheny v. ACLU*, 492 U.S. 573 (1989). *See Freedom*, 626 F.3d at 7. Under the "endorsement" gloss, "[t]he purpose prong of the Lemon test asks whether government's actual purpose is to endorse or approve religion[,]" and "[t]he effect prong asks whether --  irrespective of government's actual purpose -- the practice under review in fact conveys a message of endorsement or disapproval" to the intended audience. *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring). An affirmative answer to either question renders the challenged government act invalid. *Id.*

The predominate feature that endorsement analysis has added to Establishment Clause jurisprudence, particularly with respect to public schools, is the oft-stated principle that the government act must be evaluated to determine if it "*sends the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the community.*" *Freedom*, 626 F.3d at 10 (quoting *Santa Fe*, 530 U.S. at 309-10, in turn quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring) (emphasis added).  This message is sent when government appears to take a position on questions of religious belief, or to make "adherence to a religion relevant in any way to a person's standing in the political community." *Allegheny*, 492 U.S. at 594.

Although the *Lemon* test has been criticized, the Supreme Court has never overruled it, *see  Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011); *Freedom*, 626 F.3d at 9 n.

---

entanglement is "excessive" are similar to the factors used to examine "effect[,]" 521 U.S. at 232, and concluding it "is simplest to recognize why entanglement is significant and treat it … as an aspect of the inquiry into … effect." *Id.* at 233. Thus Plaintiff will discuss the installation and maintenance of the School Prayer display with respect to its "purpose" and "effect".

16, and a majority of the Supreme Court applied *Lemon* – specifically the "purpose" test – to the display of gold framed copies of the Ten Commandments in county courthouses in *McCreary*. *See* 545 U.S. at 860 ("When government acts with the ostensible and *predominant purpose* of advancing religion, it violates the central Establishment Clause value of official government neutrality, there being no neutrality when the government's ostensible object is to take sides.") (citing *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335 (1987)).[6]

We address the elements of the *Lemon* "purpose" and "effect" tests, as refined by endorsement analysis below.

---

[6] Although the plurality in *Van Orden* determined that the *Lemon* test was "not useful in dealing with the sort of passive [Ten Commandments] monument that Texas ha[d] erected on its Capitol grounds[,]" and instead focused its analysis on "the nature of the monument and . . . our Nation's history[,]" 545 U.S. at 686, Justice Breyer, who cast the fifth vote, joined the plurality's judgment but not its opinion. He declined to join the plurality in rejecting *Lemon* for all "passive" display cases, but instead found it unhelpful only in limited circumstances into which *Van Orden* fit. 545 U.S. at 700. Consequently Justice Breyer's more narrow rationale is the controlling rationale of *Van Orden* with respect to the *Lemon* test. *See Marks v. United States*, 430 U.S. 188, 193 (1997) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as that position of those members who concurred in the judgment on the narrowest grounds[.]").

Justice Breyer had joined the majority opinion in *McCreary* reaffirming and applying the *Lemon* test, but in his *Van Orden* concurrence he envisioned certain "difficult borderline cases," such as the Ten Commandments monument on the Texas State Capitol grounds, for which the *Lemon* test might not suffice. 545 U.S. at 700. However, he specifically excluded from this category of "difficult borderline cases" those displays "on the grounds of a public school, where given the impressionability of the young, government must exercise care in separating church and state." 545 U.S. at 703 (citing *Stone*, *supra*). Moreover, his analysis with respect to the Ten Commandments monument in the state capitol grounds did not entirely eschew the *Lemon* factors, but rather used them as guideposts in a fact-intensive assessment of whether the government's action was faithful to the underlying purposes of the Establishment Clause. *Id.* at 698-699. And he acknowledged that to realize those goals government must "effect no favoritism among sects or between religion and nonreligion[.]" *Id.* at 698 (internal citations omitted).

**2.)** **The School Officials' decision to display a "School Prayer" was for the predominant purpose of endorsing religion and the religious practice of prayer.**

"Purpose" analysis asks whether the School Prayer is displayed for a secular or religious purpose. *See Freedom*, 626 F.3d at 4. It is designed to prevent government from "abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Skoros v. City of New York*, 437 F.3d 1, 18 (2d Cir. 2006) (quoting *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987)). The Supreme Court's most recent instructions on the scope of "purpose" analysis are found in *McCreary*.

Purpose is evaluated from the perspective of an "objective observer" who considers "the traditional external signs" that appear in the "text, . . . history, and implementation" of the governmental act, 545 U.S. at 862 (quoting *Santa Fe, supra*, at 308), and whether "a religious objective permeated the government's action." *Id.* at 862. If an objective observer would determine that the government was acting with a predominantly religious purpose, the requirement of government neutrality with respect to religion has been violated. *See McCreary*, 544 U.S. at 865 (juxtaposing "no adequate secular object, as against a predominantly religious one"); *Edwards*, 482 U.S. at 590 (referring to the inquiry as one into "preeminent" or "primary" purpose); *Stone*, 449 U.S. at 41 (looking to the "pre-eminent purpose" of government action). The objective observer is also "presumed to be familiar with the history of the government's actions and competent to learn what history has shown." *McCreary*, 545 U.S. at 866.

Considering the text of the religious display, the context and forum in which it appears, and the history of Cranston's actions, an objective observer would conclude that a "religious objective permeated" their actions. *McCreary,* 545 U.S. at 862. In *McCreary*, the Court

recognized that "governmental action itself" may demonstrate a predominantly religious purpose, 545 U.S. at 862, and that principle is fully applicable here.  We start with the description given to the text and the display – "School *Prayer*" – because such labels "are quite important in determining not only the purpose behind the action at issue . . ., but also their nature, likely effects, and the degree to which they are likely to be perceived as state endorsement . . . or promotion of religion."  *Holloman v. Harland*, 370 F.3d 1252, 1289 (11th Cir. 2004).

Prayer itself is a quintessentially religious practice that is both fundamentally and intrinsically religious in character.  *Karen B. v. Treen*, 653 F.2d 897, 901 (5th Cir. 1981).  The purpose of prayer "is always active – to invite divine intercession," *Newdow v. Rio Linda School District*, 597 F.3d 1007, 1021 (9th Cir. 2010), and constitutes "a solemn avowal of divine faith and supplication for the blessing of the Almighty."  *Engel*, 370 U.S. at 424.  Prayer is "an address of entreaty, supplication, praise or thanksgiving directed to some sacred or divine spirit, being, or object."  *Treen*, 653 F.2d at 901.  *See also  Catechism of the Catholic Church* 2559 (1994) ("Prayer is the raising of one's mind and heart to God or the requesting of good things from God."); *The American Heritage Dictionary of the English Language* 1379 (2006) (defining "prayer" as "[a] reverent petition made to God, . . . an act of communion with God, . . . [or] a specially worded form used to address God[.]").

Moreover, the address to "Our Heavenly Father" overflows with religious, and predominantly Christian, significance.  Both the composition and the use of the School Prayer followed the school's practice of reciting the "Our Father," or Lord's Prayer, the fundamental Christian prayer of the Catholic Church.  *Catechism of the Catholic Church*, 2759 (1994).  In that tradition "Our Father" refers to God, *see id.* at 2786, and "heavenly" relates to "the abode of

God," *see* The American Heritage Dictionary, *supra,* at 811. Cranston's unquestionable intent, first by having the students recite a "prayer" to "Our Heavenly Father," and then in displaying the same prayer in the school auditorium, was to endorse, suggest, and encourage a religious practice – prayer – and a religious belief – in God, and, at least arguably, a Christian God. The imprimatur of Cranston's authority was plainly placed on both. Tasking a student to write a "School Prayer," organizing the students to recite it, and then authorizing a prominent painted display of the Prayer on the auditorium wall, all demonstrated Cranston's intent to endorse and encourage its students' belief in a divine being and to exercise the practice of "raising of one's heart and mind to God" as part of their school experience. *See Catechism of the Catholic Church*, 2559. That was its purpose when installed in the early 1960s, and Plaintiff maintains, that is the predominant purpose of continuing to maintain its display today. However worthwhile that goal might have seemed then, or might seem to be today, it is not within the domain or authority of state or local government under the Establishment Clause: questions of religious belief and religious practice are for individuals, and, in the case of secondary school students, they are the responsibility and private domain of the family, and whatever religious community they may choose to be a part of – not public schools or their officials.

The Supreme Court decision in *Wallace v. Jaffree, supra*, offers a useful comparison. In *Jaffree*, an Alabama statute providing for a moment of silence in public schools for "meditation" was amended to describe the purpose of the moment of silence to provide for "meditation *or voluntary prayer*." 472 U.S. at 59 (emphasis added). Because the prior statute already protected the right of students to engage in voluntary silent prayer during the moment of silence, the Court concluded that the addition of the phrase "or voluntary prayer" to the statute revealed the State's intent "to characterize prayer as a favored practice[,]" and held that "[s]uch an endorsement is

not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Id.* at 60; *see* 472 U.S. at 78-79 (O'Connor, J., concurring) (finding that legislature's addition of the words "or voluntary prayer" conveys government "approval of the child who selects prayer over other alternatives during a moment of silence. * * * It endorses the decision to pray during a moment of silence, and accordingly sponsors a religious exercise.").

Just as the specific inclusion of the word "prayer" in *Jaffree* revealed a governmental purpose to convey government approval and endorsement of prayer, Cranston's adoption and display of a self-described "School Prayer" as the means for students to strive for moral and ethical conduct reveals that the municipal school's purpose – both in establishing and displaying the prayer in the 1960's, and in determining to keep it displayed without change in 2011 – was – and remains – to convey an approval and endorsement of a prayer to "Our Heavenly Father," as the means of achieving that moral and ethical conduct.

The fact that the School Prayer purports to promote secular student civic values does not make it any less a violation of the First Amendment, because "teaching students that praying is necessary or helpful" to achieve civic goals is itself a violation of the Establishment Clause. *Holloman*, 370 F.3d at 1285-86.  "[A] person attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a constitutionally impermissible purpose."  *Id*. at 286; *see also  Jaffree v. Wallace*, 705 F.2d 1526, 1534-35 (11th Cir. 1983), *aff'd sub nom. Wallace v. Jaffree*, 472 U.S. 38 (1985) ("Recognizing that prayer is the quintessential religious practice implies that no secular purpose can be satisfied[.]").  By embodying those goals in a School Prayer, Cranston converted what might have otherwise been stated as an inoffensive exhortation to be good student-citizens "into an effort by the majority to use the

machinery of the State to encourage the minority to participate in a religious exercise." 472 U.S. at 73 n. 2 (O'Connor, J., concurring).

The fact that the School Prayer is now only displayed rather than recited and displayed does not lessen its constitutional infirmity. *Stone v. Graham, supra*, is instructive in this regard. *Stone* addressed a Kentucky statute that required the posting of a copy of the Ten Commandments, purchased with private contributions, on the wall of each public classroom in the state. 449 U.S. at 39. But Kentucky attempted to mitigate the overt religious purpose of the requirement by including a requirement that each display of the Ten Commandments contain the notation that: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41 (internal citations omitted).

The Court nonetheless found a violation of the Establishment Clause, because: 1) the Ten Commandments "are undeniably a sacred text in the Jewish and Christian faiths, and no recitation of a supposed secular purpose can blind us to that fact[;]" 2) they were not "integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like[;]" and 3) therefore "[t]he preeminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature." *Id.* at 41-42. And the Court specifically explained that it was constitutionally insignificant that the Bible verses "were posted on the wall, rather than read aloud[,]" *id.* at 42, because:

> If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. *However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.*

*Id.* at 42 (emphasis added).

Like the Ten Commandments display in *Stone,* the School Prayer display conveys an undeniably religious message, and it is displayed to be read, and when read, to convey its religious message of belief in God and the religious practice of prayer. The written message is no less infused with religious meaning and purpose than the Ten Commandments display in *Stone,* or the phrase "voluntary prayer" added to the statute in *Jaffree.* The 2011 decision of Cranston, through its School Committee, considered over several months, to retain the School Prayer and to resist any effort to change it, is further evidence (if any were necessary) of its religious purpose.  As the minutes of those many meetings reflect, the School Committee was presented with the alternative of altering the Prayer so as to remove the distinct language of prayer while retaining the goals of student citizenship in a form that does not involve petitions or exhortations to God.  The statements of the School Committee members preceding the vote to retain the School Prayer and to resist any challenge to it provide further evidence of its religious purpose.[7]

> **3.)  Cranston's display of a "School Prayer" has the effect of conveying a message of official endorsement of religion and the religious practice of prayer.**

Establishment Clause analysis also mandates that the *effect* of the challenged action neither "endors[e], favor[], or promot[e] religion."  *Freedom*, 626 F.3d at 10 (citing *Allegheny*, 492 U.S. at 593-94).  As Justice O'Connor explained in *Allegheny*, the concept of endorsement is not limited to government coercion or efforts to proselytize; it is intended to take account of "the

---

[7]   See 3/7/11 Min. at 75-86.  Most of the statements—regardless of how the individual was voting—included reflections upon their own religious beliefs and the importance of religion in their personal lives.  One acknowledged the Prayer's "religious overtone but with secular and historical significance" (Lombardi, *id.* at 85); another explained that he was guided by his personal religious views, that the Prayer was not offensive, promoted good virtues and moral values and was consistent with his practice in 25 years of coaching Cranston students of leading the students in a prayer before a football game or wrestling match (Traficante, *id.* at 80).

numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others." 492 U.S. at 627-28 (O'Connor, J., concurring in part and concurring in the judgment).

While the endorsement analysis does not require the courts to "sweep away all governmental recognition and acknowledgement of the role of religion in the lives of our citizens[,]" *Allegheny*, 492 U.S. at 623, it does require courts to ensure that the government does not appear to take a position "making adherence to religion" or religion itself "relevant in any way to a person's standing in the political community." *Freedom*, 626 A.2d at 10 (quoting *Allegheny*, 492 U.S. at 593-94). A government's appearance of endorsement constitutes a constitutional injury under the Establishment Clause if it sends "the stigmatic message" to nonadherents of the religious view endorsed by the government that they are "outsiders," and therefore not wholly full members of the political community, as compared to the more favored "insiders" who do adhere to the government's view. *Trunk*, 629 F.3d at 1109 (quoting *Santa Fe*, 530 U.S. at 309-10).

Just as with "purpose" analysis, "effect" analysis is also evaluated from the perspective of an "objective observer." *Freedom*, 626 F.3d at 10; *Skoros*, 437 F.3d at 29.[8] That is, it considers

---

[8] Examining religious displays in primary and secondary schools, a majority of the Second Circuit panel in *Skoros, supra*, "assumed[d]" that the reasonable observer for the "effect" inquiry should be an "adult who, in taking full account of the [school district] policy's text, history and implementation, *does so mindful that the displays at issue will be viewed primarily by impressionable school children*." 437 F.3d at 23 (emphasis added). The majority recognized that the intended recipient of the display message was "undoubtedly an important factor" to be considered by the reasonable observer, *id.*, who, when evaluating whether the display conveyed a message of endorsement or approval of religion, would consider "*that school children are the intended audience for the displays, that these children are being reared in a variety of faiths (a well as none), and that, by virtue of their ages, they may be especially susceptible to any religious messages conveyed by such displays.*" *Id.* at 24-25 (emphasis added). Essentially, the majority determined that adult objective observers would put themselves "in the student's shoes."                                      (footnote continued on next page)

whether, regardless of the government's purpose, a "reasonable observer . . . aware of the history and context of the community and forum where the religious display appears," would understand it to endorse religion, or one religion over another.  *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment).

And that in fact is how the Supreme Court has evaluated the effect of the message where the intended recipient of the message is a high school student.  *See, e.g., Santa Fe*, 530 U.S. at 307 ("[T]he expressed purposes of the policy encourage the selection of a religious message and that is precisely how *the students* understand the policy.") (emphasis added); *id.* at 308 "([A]n *objective Santa Fe High School student* will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval.") (emphasis added); *Board of Education of Westside Community Schools (District 66) v. Mergens*, 496 U.S. 226, 249-52 (1990) (examining whether an objective observer in the position of a secondary school student "will perceive official school support for . . . [on-campus] religious meetings").

Equally important, because any Establishment Clause inquiry in the public school context must determine whether "school sponsorship of a religious message . . . sends the ancillary

---

One judge dissented, instead focusing on the "essential command of the Establishment Clause": "preventing government from mak[ing] a person's religious beliefs relevant to his or her standing in the community," and from "sending a clear message" to individuals that "they are outsiders or less than full members of the political community." 437 F.3d at 47 (Straub, J., concurring in part and dissenting in part) (quoting *Allegheny*, 492 U.S. at 627 (O'Connor, J., concurring in part and concurring in judgment)).  He also concluded that a court "must not lose focus on who is actually the recipient of the message conveyed and how that message will affect such a recipient[,]" but concluded the reasonable observer should be considered from the perspective of *a student*, not the adult described in the majority opinion.  *Id*

The only apparent difference between the two "reasonable observer" views, however, is whether the Court, in evaluating the evidence, should step into the shoes of an adult, who in turn is imagined to step  into the shoes of a student, or whether the Court should step directly into the shoes of a student.  Since both standards ultimately focus on the perspective of a student at the school where the religious message is displayed, the result should ultimately be the same.

message to members of the audience who are *nonadherents* that they are outsiders," *Santa Fe*, 530 U.S. at 309-10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)) (emphasis added), this Court must also consider the effect of the message on a reasonable "nonadherent" observer. *Skoros*, 437 F.3d at 54 (Straub, J., concurring in part and dissenting in part); *see also Capitol Square Review*, 515 U.S. at 799 (Stevens, J., dissenting) ("It is especially important to take account of the perspective of a reasonable observer who may not share the particular religious belief [the display] expresses.").

In the context of this case then, that means the question is whether a reasonable observer, who does not adhere to the religious message conveyed, would see the message as endorsing or favoring religion or a particular religious view or practice. The prominent display of the Cranston West "School Prayer" would unmistakably convey a message of endorsement, by the school and its officials, of belief in God and the religious activity of prayer.

For all the reasons stated in the previous section, any reasonable, objective high school student would recognize that:

- the display would not be on the wall of the school auditorium without the approval and endorsement of the School Officials;

- the display's text is religious, it is a prayer to God;

- "Our Heavenly Father" refers to God, most likely the same God represented in the Christian prayer beginning with "Our Father who art in Heaven;" and

- it is a prayer intended to be viewed or considered by Cranston West students in order to achieve the virtues in the prayer.

That objective high school student would see that the School Prayer, like the School Creed, is permanently embedded in the auditorium wall, is not associated with a particular era or graduating class, and intended to be embraced by all Cranston West students. The objective high school student, familiar with the history of Cranston West, would understand that the School

Prayer was created and adopted as "the Official Prayer of Cranston High School West." And that objective student would be aware that Cranston, by its governing School Committee, after heated debate prominently featuring the religious message and its importance on the one hand and a dire fiscal environment on the other, had re-endorsed and ratified the School Prayer as vitally important to the fabric of the public school itself and being an exemplary Cranston West student citizen.

The Supreme Court has made it plain that under the Establishment Clause school sponsorship of a religious message is impermissible because "it sends the ancillary message to members who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" *Santa Fe*, 530 U.S. at 309-310 (quoting *Lynch*, 465 U.S. at 668). "School" prayers, whether recited, or silently but prominently displayed by the government on school property in school locations where students are required to be, violate this core First Amendment principle.

"When public school officials, armed with the State's authority, convey an endorsement of religion to their students, they strike near the core of the Establishment Clause[, and h]owever, 'ceremonial' their messages may be, they are flatly unconstitutional." *Lee v. Weisman*, 505 U.S. at 631 (Souter, J., with whom Stevens, J., and O'Connor, J., join, concurring). Cranston West's School Prayer fails this test.

**III.) Irreparable Injury.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). *Elrod* involved political speech that was either threatened or in fact being

impaired at the time relief was sought, *id.*, but this principle of irreparable injury has also been applied to alleged Establishment Clause violations. *See, e.g., Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006); *American Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd on other grounds*, 545 U.S. 844 (2005). With respect to Establishment Clause claims, "a successful showing on the first factor [-- likelihood of success on the merits--] mandates a successful showing on the second factor – whether the plaintiff will suffer irreparable harm." 354 F.3d at 445; *see also Chaplaincy*, 454 F.3d at 304.

When an Establishment Clause violation is alleged, the constitutional injury occurs the moment the government action takes place, 454 F.3d at 303, because the liberty interest at stake under the Establishment Clause is implicated as soon as the government engages in an impermissible endorsement of religion, sending "a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Id.* at 302 (quoting *Lynch, supra*, 465 U.S. at 688 (O'Connor, J., concurring)).

The harm inflicted by a governmental endorsement of religion "is self-executing and requires no attendant conduct" on the part of the Plaintiff, because the government action is all that is necessary to inflict immediate and irreparable injury to the Plaintiff under the Establishment Clause. *Id.*

## IV.)     Balance of Hardships and the Public Interest.

At this point in the litigation, Plaintiff seeks an order requiring that the prayer be covered – not removed or altered – pending decision on the merits. This could be accomplished by the installation of a cover or board sufficiently affixed so that it cannot be casually or easily

Case 1:11-cv-00138-L -DLM Document 6 Filed 05/25/11 Page 41 of 42 PageID #: 67

removed. The hardship to Cranston in providing such a covering is minimal in terms of expense and effort, and if Plaintiff is unsuccessful on the merits, the display can be restored in its wholly original form. Balanced against the minimal expense to Cranston of affixing a covering, is the continuing irreparable injury to the Plaintiff's constitutionally protected interests under the Establishment Clause. The continuing prominent public display of the "School Prayer" maintains that constitutional injury, and it continues to violate Cranston's obligation of neutrality with respect to issues of religion in its public schools. The hardship represented by the temporary and minimal expense and effort to cover or board over a portion of the wall in a school auditorium is substantially outweighed by the continuing constitutional injury to Plaintiff, as demonstrated in the previous sections, and that balance favors a preliminary injunction.

With respect to interests of the general public, as distinct from the interests of the parties, a preliminary injunction would not prevent a single student from praying to a "Heavenly Father" or any other divine conception, if so motivated, in their own private way. It would not prevent teachers or other school administrators and officials from encouraging students to conform to the civic values described in the prayer's petition. In short, a preliminary injunction ordering a temporary covering would not interfere with personal reflection or instruction on the civic virtues, but would prevent only a government approved and endorsed message, that good Cranston West student-citizens pray to "Our Heavenly Father," a message that conveys the corresponding message that those who derive their moral conduct from another source, divine or not, are somehow lesser members of the school community.

## Conclusion

For the above-stated reasons, Plaintiff asks this Court to find that the Cranston West School Prayer display has both a predominantly religious purpose and effect in violation of the

Establishment Clause, that the constitutional violation is causing the minor Plaintiff irreparable harm, and that the balance of harms favors a preliminary injunction requiring the Defendant to cover the School Prayer display pending decision on the merits.

Respectfully submitted,

    /s/ Thomas R. Bender          
Thomas R. Bender,  #2799
Hanson Curran LLP
      Cooperating Counsel,
Rhode Island Affiliate,
American Civil Liberties Union
One Turks Head Place, Suite 550
Providence, RI 02903
trb@hansoncurran.com
(401) 421-2154
(401) 521-7040 (fax)

      /s/ Lynette Labinger          
Lynette Labinger        #1645
Roney & Labinger LLP
      Cooperating Counsel,
Rhode Island Affiliate,
American Civil Liberties Union
344 Wickenden Street
Providence, RI 02903
labinger@roney-labinger.com
(401) 421-9794
(401) 421-0132 (fax)

## Certificate of Service

I hereby certify that on May 25, 2011, a true copy of the foregoing document was served upon each attorney of record listed below by electronic filing of this document with the United States District Court for the District of Rhode Island:

Joseph V. Cavanagh, Jr.
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903-1765
jvc@blishcavlaw.com

Joseph V. Cavanagh, III
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903-1765
jvc3@blishcavlaw.com

      /s/ Lynette Labinger