UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARK AHLQUIST, as next friend, parent
and guardian of JESSICA AHLQUIST, a
minor,
Plaintiff,

v.                                              C.A. No. 11-138L

CITY OF CRANSTON, by and through
Robert F. Strom, in his capacity as
Director of Finance, and by and through
the School Committee of the City of
Cranston, and SCHOOL COMMITTEE OF THE
CITY OF CRANSTON, by and through Andrea
Iannazzi, in her capacity as Chair of the
School Committee of the City of Cranston,
Defendants.

## DECISION AND ORDER

RONALD R. LAGUEUX, Senior United States District Judge.

This matter is before the Court on Plaintiff's Motion for a
Permanent Injunction, demanding that Defendants remove or alter
the Christian prayer that is affixed to the wall of the
auditorium in one of the City of Cranston's public high schools.
Defendants include the City of Cranston, Rhode Island, and its
School Committee.  Plaintiff Jessica Ahlquist (hereinafter
"Plaintiff") presently attends the high school, known as Cranston
High School West (hereinafter "Cranston West"), as an eleventh
grader.  Defendants, who have refused to alter or remove the
prayer, now argue that Plaintiff does not have the requisite
standing to bring her complaint.  In addition, Defendants argue
that the prayer, which dates back to the early 1960s, is an

historical memento of the school's founding days, with a predominantly secular purpose.

After Plaintiff filed her Motion for Preliminary Injunction, the parties agreed that the Motion be consolidated with the trial on the merits, and stipulated that documentary evidence, including depositions, be presented to the Court in lieu of live testimony.  A hearing took place on October 13, 2011, preceded by a judicial view of Cranston West.  The issues have been fully briefed, the Court has reviewed the evidence, and the matter is now in order for decision.  The Court rules that Plaintiff has standing in this matter and rules in her favor on the merits of this dispute.  The Court also orders the immediate removal of the Prayer Mural from the auditorium at Cranston West.

## Background

Cranston West opened in the fall of 1959 to accommodate the growing suburban population of Cranston, Rhode Island.  Prior to the opening of Cranston West, the City's high school students had all attended Cranston High School, which then became designated as "Cranston East" to reflect its geographic location.  Cranston West was constructed in phases, with the stand-alone auditorium building opening in the fall of 1963.  In its early days, Cranston West's population included junior high school students. The first group of high school graduates was the Class of 1963.

### *The Prayer's origins*

During the school's first academic year, only seventh and eighth graders were in attendance.  The student council selected the school's mascot and team colors, and a seventh grader by the name of David Bradley was assigned the task of authoring the school's creed and school prayer.  As was the wide-spread custom of the time, Cranston West opened its school day with the recitation of the Lord's Prayer.  Those who attended Cranston West in those days recall that it was the short version of this prayer, commonly known as the Catholic version.  The Protestant version is longer, but both begin "Our Father which art in heaven."  This is the prayer that Jesus taught to his disciples. In 1960, after the School Prayer was adopted by Cranston West's student council and approved by the school's administration, then it was recited in homeroom or over the public address system each day, instead of the Lord's Prayer.  Around 1962, this practice was discontinued and replaced by a moment of silence, as a result of the U.S. Supreme Court's decision in <u>Engel v. Vitale</u>, 370 U.S. 421, 82 S.Ct. 1261 (1962), which held prayer in public schools to be constitutionally impermissible.

In the beginning of the 1963-64 academic year, at a school-wide assembly, the Class of 1963 presented to the school a gift of two murals, one with the school creed and one with the School Prayer, to decorate the walls of the new auditorium.  The murals had been painted by a professional, and were installed on either

side of the auditorium's stage.  Although the plans for the
murals had been approved by the school administration at every
phase, all the expenses of creating the murals were paid through
fund-raising undertaken by the Class of 1963.

### *The Prayer Mural now*

The murals are large, approximately 8 feet in height and 4
feet wide.  According to some witnesses, their text is visible
throughout the auditorium, and legible from much of the room
because the lettering is large; each letter is approximately 3
inches tall and 2 inches wide.  The murals are painted on paper,
and affixed directly onto the auditorium's walls.  Someone with a
first-hand memory recalled that a border had originally been
painted around the edge of the murals, along with a notation that
they were gifts of the Class of 1963.  However, since then,
presumably when the auditorium walls were repainted, the borders
and gift notations were painted over.  Now, as paint covers the
edge of the murals, it appears that the text has been painted
directly onto the wall.

Each mural bears an illustration at the top, a title, then
the text below.  The Prayer mural hangs on the right-hand side of
the stage, next to the clock, and reads as follows:

SCHOOL PRAYER

OUR HEAVENLY FATHER,
GRANT US EACH DAY THE DESIRE TO DO OUR BEST,
TO GROW MENTALLY AND MORALLY AS WELL AS
PHYSICALLY,

-4-

TO BE KIND AND HELPFUL TO OUR CLASSMATES AND
TEACHERS,
TO BE HONEST WITH OURSELVES AS WELL AS WITH
OTHERS,
HELP US TO BE GOOD SPORTS AND SMILE WHEN WE
LOSE AS WELL AS WHEN WE WIN,
TEACH US THE VALUE OF TRUE FRIENDSHIP,
HELP US ALWAYS TO CONDUCT OURSELVES SO AS TO
BRING CREDIT TO CRANSTON HIGH SCHOOL WEST.

AMEN

Currently, the auditorium is used frequently by the student body
for mandatory assemblies, as well as non-required extracurricular
activities.  The auditorium is also used by the faculty, parents
and other members of the community.  Plaintiff testified that she
attended eight to ten events in the auditorium during her
freshman year.

### Other school decor

The text of the School Creed, which hangs on the left-hand
side of the stage, is not the subject of the present dispute
because it contains no religious references.[1]  The auditorium
walls are also lined with decorative cloth banners, gifts from
subsequent graduating classes, that bear no message beyond, for
example, "Class of 1986."  Other class gifts, monuments and

---

[1] Although David Bradley stated at his deposition and before
the School Committee that he recalls drafting the School Creed,
its text is the same as the text of the School Creed which, along
with a School Prayer, have been displayed at Cranston's Hugh B.
Bain Middle School since the 1920s.  The Bain School Prayer also
opens with "Heavenly Father." Both Bain murals were removed from
that school's walls as this litigation commenced.

-5-

markers can be found at other locations around the school. Several trophy cases line the corridor by the office in the main building of the school.

The entrance to the school is decorated with a series of large banners, suspended from the vaulted ceiling.  These banners each bear a large paragraph-length message which Defendants explain are the standards issued by the New England Association of Schools and Colleges, with titles such as the "Student Mission Statement" and a "Statement of Civic Expectations."  These mission statements, along with the School Creed, are reprinted each year in the handbooks that are distributed to all students. At his deposition, School Committee Member Frank Lombardi opined that the Prayer Mural is an historic relic, and is readily distinguishable from other "modern-looking" banners throughout the school, that bear contemporary messages of inspiration for the student body, because the Prayer Mural is "old-looking."

### The Plaintiff

Plaintiff entered Cranston West in the fall of 2009 as a ninth grader.  That spring a friend pointed out the School Prayer to her, as she had not noticed it beforehand despite attending several assemblies in the auditorium.  As a child, Plaintiff was a Catholic, but at age ten or eleven she became an avowed

atheist.[2]  She testified at her deposition that she was upset when
she realized that there was a Christian prayer displayed in her
school, and she experienced feelings of exclusion and ostracism.
She began to talk with her family and with her friends and peers
at school about the Prayer Mural.  Many students were offended by
her objections to the Prayer Mural, and some did not hesitate to
demonstrate their disrespect for her feelings.  During the
summer, Plaintiff learned that someone else had complained about
the Prayer Mural to the American Civil Liberties Union ("ACLU").
Indeed, Defendants explain that, in July 2010, they received a
letter from the ACLU complaining about the Prayer Mural, written
on behalf of an unnamed family with two children in Cranston
public schools.  Also that summer, Plaintiff started an on-line
Facebook page dedicated to a discussion of the Prayer Mural.  It
appears from various references in the record that there was
press coverage about the issue during the summer, in the local
Cranston weekly paper, in the <u>Providence Journal</u>, and in national
news as well.

### The School Committee meetings

By the time the School Committee convened to address the
ACLU's letter, on August 16, 2010, the debate had already become
heated, and many members of the community attended the meeting

---

[2] An atheist does not believe in the existence of a supreme
being.

and spoke about the Prayer Mural.  The first two speakers were
the Reverend Dr. Donald Anderson, Executive Minister of the Rhode
Island State Council of Churches, and Rabbi Amy Levin of Temple
Torat Yisrael in Cranston, Vice President of the Rhode Island
Board of Rabbis, both of whom expressed the point of view that
the Prayer Mural should be altered or removed.  Two more speakers
agreed; one of whom was interrupted from the floor, compelling
the School Committee Chair to call for order.  Seven people spoke
in favor of the Prayer Mural remaining.  Four more speakers were
on the fence, wanting the Mural to stay but also wanting to avoid
a lawsuit.  After the public comment portion of the meeting
concluded, the School Committee addressed Superintendent Peter
Nero's resolution that a subcommittee be formed to reword the
Prayer in order to convey its message without religious
references.  Stating, "I cannot leave God at the doorstep because
I believe in God.  I'm very religious and I pray every day,"
School Committee member Lombardi offered an amendment that the
subcommittee also consider leaving the Prayer Mural up and that
the subcommittee be tasked with researching options for defending
the ACLU's potential lawsuit.  The resolution, with the
amendment, was then passed unanimously.[3]

    The subcommittee met, in a public forum, in November 2010

---

[3] School Committee member Steve Stycos cast the sole vote
against the amendment in a separate roll call; then voted with
the others in favor of the resolution as amended.

and February 2011.  At the November meeting, subcommittee members initially focused on the idea of rewording the Prayer to remove religious references.  However, some on the subcommittee wanted first to explore the option of donated legal services that would enable Cranston to defend the Prayer against a possible lawsuit without incurring costs.  Several speakers from the public contributed, including Plaintiff who professed her atheism and opposition to the presence of the Prayer Mural.  Plaintiff recalled later that she received an angry response from others in the audience.  One citizen, who spoke after Plaintiff, suggested that, "If people want to be Atheist, it's their choice and they can go to hell if they want."  At the end of the meeting, Plaintiff and her companion, who had also spoken out against the Prayer Mural, were escorted from the meeting by the police because of concerns for their safety.

At the February meeting, Plaintiff spoke again.  Two speakers who followed Plaintiff suggested that she be charged with a hate crime.  Although members of the subcommittee urged speakers to address their remarks to the committee, many of the speakers looked directly at Plaintiff when it was their turn to speak.  Almost all of the speakers referenced their personal religious beliefs.  For example, one speaker stated:

> Jesus said, if you are ashamed of me, I will
> be ashamed of you before my Father.  Not
> ashamed, please pass this on.  I do believe
> this.  People forget that we were born under

God Almighty.  If it wasn't for God Almighty
we wouldn't be here.  It's just like I keep
saying to everybody else and everything there
is, "You can have your fun here on earth but
on Judgment Day you're going to be standing
before God Almighty and you're going to
say...you know he's going to say..."  I don't
know what he's going to say but all I know is
that you're going to be happy to see Him face
to face.

On March 7, 2011, the full School Committee met in order to
listen to public comments again, and review the subcommittee's
recommendation.  Eight students spoke; four in favor of the
retaining the School Prayer Mural and four, including Plaintiff,
requesting that it be removed.  The student speakers were
followed by twenty-six adult speakers, from Cranston as well as
other communities.  Of those speakers, twenty-four spoke in favor
of retaining the Prayer Mural.  Only two were against.  A video
recording of the meeting reveals a rowdy and belligerent
atmosphere.  Speakers in favor of retaining the Prayer Mural were
often interrupted by calls of "Amen" from the audience, and they
were usually followed by loud applause and whoops.  The speakers
who favored the Mural's removal were booed.  Several of the
speakers pointed to Plaintiff and her companions while angrily
lambasting her point of view, though at least one of these
speakers was instructed by a School Committee member to address
her remarks to the Committee.  Several speakers suggested that
Plaintiff and others like her should try looking at the blank

wall, rather than at the School Prayer, if they were bothered by it.

The majority of the speakers described their own religious beliefs and the importance of religion in their lives, and several quoted from the Bible.  Many expressed their opinion that the Prayer was non-denominational and that the Prayer reflected important secular values shared by all members of the Cranston community – values that they wanted imparted to their children. In this vein, a few speakers mentioned that they remembered the days when prayers were recited in school, and that it wasn't a big deal and no one minded, including Jewish students.

One speaker said, "If you take the banner down, you are spitting in the face of Almighty God."  She continued:

> As far as the atheists, you know what?
> You're entitled to your opinion however wrong
> you are.  But the fact of the matter is, God
> exists...  If this banner is taken down, you
> are indeed establishing a bunch of people who
> are not going to believe in God, and on
> Judgment Day, you will be judged because you
> stand before Almighty God.

Several speakers talked about the importance of adhering to one's religious beliefs in all aspects of one's life.  "You're not a part-time Catholic; you are a Catholic," one speaker said, "You can't vote to take this down and say that you're standing with God."  Another speaker implored the School Committee to retain the Prayer Mural, "Don't check your morals at the front door...

Please don't ruin our way of life."  The final speaker, a self-described atheist, nonetheless threatened that if the ACLU came to take down the Prayer Mural, he would assemble a group of people to surround the school and protect the Mural.

At the conclusion of the public comment, School Committee member (and former mayor) Michael Traficante explained that the subcommittee had been instructed to consider three options: 1) keep the Mural; 2) remove the Mural; or 3) alter the display by either changing the text to remove religious references or by adding additional banners representing other religions. Traficante reported the subcommittee had decided to recommend that the Prayer Mural be retained as is.  Following another round of enthusiastic applause, the School Committee and administrators had the opportunity to express their views.

First, Peter Nero, the superintendent of schools for the City, described the importance of Catholicism to him and his family, and his life-long commitment to his religious faith.  He stated that he had initially been concerned about the potential costs of defending a lawsuit, but he had ultimately decided to recommend that the Prayer Mural be retained.

Lombardi, who opened his remarks by commending all the students who spoke, also described himself as a practicing Catholic.  Stating that he would vote in favor of retaining the Prayer Mural, he explained that he believed the Prayer to be

innocuous because it was non-denominational, as the notion of 'Heavenly Father' was common to many religions.  Later, at his deposition, Lombardi declared that his intent in voting to retain the Prayer display was a secular one.  He stated further that he believed that this was the case for all of the School Committee members who voted to retain the Prayer: "...I clearly believe that the School Committee acted the way it did because of the context of this particular tablet on this particular wall and its historical significance, and it had nothing to do with religion at all."

Traficante spoke next and began by describing himself as "a person of faith."  A former coach, he recalled always opening sports events with a prayer.  "Not to offend," he said, "but to pray to keep them safe during that athletic event...Not to offend, but to provide a spiritual message of hope."  Expressing his opinion that the Prayer was non-denominational and non-discriminatory, Traficante indicated that he would vote to retain the Prayer Mural.  Stephanie Culhane also prefaced her remarks with testimony concerning her religious faith, and her experiences teaching religious education to children.  However, she admonished the group for being judgmental and suggested that many in the crowd were not modeling the tolerant behavior endorsed by Jesus Christ.  She went on to discuss the financial straits confronting the school department, and, as the crowd

booed her, Culhane indicated that she would vote to remove the Mural because it was a financial gamble that she didn't want her own children and the district's children to have to pay.

Janice Ruggieri also expressed that she felt many in the audience were intolerant, which was demonstrated by their recommendation that those students who were offended by the Prayer should simply 'look the other way.'  She indicated her intent to vote to remove the Prayer Mural.  Next, Steven Bloom explained that he was Jewish, and that prayers in his faith do not reference 'Heavenly Father.'  Nevertheless, he explained that he did not find the Prayer offensive, and he recalled growing up during a time when Jewish religious observances were routinely overlooked at public school.  However, he offered, those times were different.  He expressed his belief that the School Committee was limited in its potential responses by the threat of a lawsuit, and that he would have favored some intermediate step, such as hanging additional banners representing other religions. He concluded that he intended to vote to take the Prayer Mural down, because he could not support it, "even if it's just one person who's offended by it."  At that point, Culhane interjected that a retired art teacher had suggested to her that the School take the Prayer Mural down and reproduce it in a smaller form, frame it and place it with other of the school's historical mementos.  This suggestion was roundly booed by the audience.

Paula McFarland explained that one of her parents was Jewish, but that she was not religious.  Nonetheless, she recognized the importance of tradition in the school and suggested that every student who makes a contribution to the school deserves to have it honored.  Her vote would be to retain the Prayer Mural. The floor then went to the School Committee chairwoman, Andrea Iannazzi, who noted with some chagrin that the vote was three to three.  She explained that she would break the tie by casting the fourth vote to retain the Prayer Mural, because it represented tradition and a commendable code of morals.  With that, a quick roll call vote formalized these view points, and the three-hour meeting was adjourned.

Following this meeting, Plaintiff reports that she experienced bullying and threats at school, on her way home from school and on-line.

The School Committee met again on March 21.  At that meeting, the School Committee members approved a resolution to place an explanatory marker next to the School Prayer Mural in order to:

> ...guarantee that student works of excellence be protected and conserved for current and future generations, and for historic and cultural reasons, without promoting any ethnic, political or religious content, element or elements contained or perceived to be contained therein.

In early 2011, the ACLU contacted Plaintiff and asked her if

she would serve as the plaintiff if a lawsuit were filed.
Plaintiff agreed, and this suit was filed on April 4, 2011, with
Plaintiff's father acting as her "next friend."

### *Plaintiff's public comments*

Since the lawsuit was filed, Plaintiff has had several
occasions to speak in public about her views and experiences.  At
her deposition, Plaintiff described herself as an activist
working toward the removal of religious references from
government.  She also testified that, when she first saw the
Prayer Mural, it made her feel "excluded, ostracized and
devalued."

Interviewed on a local radio show, Plaintiff confessed that
she didn't like the Catholic Church, which she described as
hypocritical.  When asked about the Prayer, she said that the
Prayer was not offensive and that its message was a positive one.
She continued, "Yeah, I'm not offended by it, but you can't –
can't violate the Constitution."  When asked about this statement
during her deposition, Plaintiff explained that she was trying to
demonstrate a detached, "grown-up" attitude about the dispute,
particularly in light of the very personal harassment that she
had experienced after publicly expressing her views.  After
Plaintiff's public comments before the School Committee, and
particularly after the lawsuit was filed, Plaintiff was subject
to frequent taunting and threats at school, as well as a virtual

on-line hate campaign via Facebook.

In a May 24, 2011, affidavit, Plaintiff recounts a mandatory assembly that she attended in the auditorium at Cranston West in April 2011, after the lawsuit was filed. At that assembly Cranston's Mayor Allan Fung was asked by a student about his views on the Prayer Mural. To loud applause, Mayor Fung responded that he wanted the Mural to stay right where it was. Plaintiff recounts that she felt devalued, "horrible, very uncomfortable, alone and isolated." The assembly in question was Cranston West's "Diversity Week" educational program; and Mayor Fung had spoken about the difficulties he had faced as a Chinese-American in the world of politics.

## Analysis

### I. Standing

Defendants argue that Plaintiff does not have standing to bring this lawsuit. Defendants point out that Plaintiff must demonstrate a real and actual injury-in-fact in order to establish proper standing; a mere philosophical or political disagreement is insufficient. Defendants argue that neither Plaintiff nor her father, co-Plaintiff Mark Ahlquist, can show an actual injury. Moreover, if Plaintiff has no standing, then her father cannot derive standing from his status as her Next Friend; nor does he have taxpayer standing, as the Prayer Mural was privately funded.

According to Defendants, Plaintiff conceded that she has suffered no actual injury when she stated several times during the radio interview that she did not find the School Prayer offensive, and that her sole objection was that she believed the display to be unconstitutional.  In addition, Defendants argue, Plaintiff cannot point to any changes in her behavior made as a consequence of the Prayer Mural.  She didn't even notice the Mural during much of her freshman year.  After a friend called her attention to it, she made no immediate complaint and admitted later that she didn't really think much about it at first. Plaintiff continued to attend both mandatory and optional events in the auditorium, making no effort to avoid the Mural.

In response, Plaintiff argues that she has experienced the type of injury that courts generally look for in Establishment Clause cases, which is commensurate with the impact of the constitutional violation in question.

Standing is a threshhold jurisdictional issue which must be resolved prior to an examination of the substantive issues in this dispute.  If Plaintiff has no standing, then this Court may not proceed because it has no jurisdiction over the lawsuit. Article III of the United States Constitution confines the jurisdiction of this Court to the resolution of cases and controversies.  <u>Valley Forge Christian College v. Americans for the Separation of Church and State, Inc.</u>, 454 U.S. 464, 471, 102

S.Ct. 752, 757 (1982).  This means that the Court may not opine

on the constitutionality of actions undertaken by legislatures,

or municipalities, but may only address those issues within the

context of a "real, earnest and vital controversy."  Id. at 471,

102 S.Ct. at 758 (quoting Chicago & Grand Trunk R. Co. v.

Wellman, 143 U.S. 339, 345, 12 S.Ct. 400, 402 (1892)).  In Valley

Forge Christian College, the Supreme Court wrote:

> The exercise of judicial power, which can so
> profoundly affect the lives, liberty, and
> property of those to whom it extends, is
> therefore restricted to litigants who can
> show "injury in fact" resulting from the
> action which they seek to have the court
> adjudicate.

Id. at 473, 102 S.Ct at 759.  The Court went on to explain that

"the concept [of standing] cannot be reduced to a one-sentence or

one-paragraph definition," id. at 475, 102 S.Ct. at 760, but

that it is more "than the psychological consequence presumably

produced by observation of conduct with which one disagrees."

Id. at 485, 102 S.Ct. at 765.

### *Injury in fact*

To determine whether or not a plaintiff has standing, the

First Circuit employs a three-part test, derived directly from

the Supreme Court's jurisprudence.  Industrial Communications v.

Town of Alton, N.H., 646 F.3d 76, 79 (1st Cir. 2011) (citing

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct.

2130, 2136 (1992)).  The plaintiff must have suffered 1) an

injury in fact; 2) which is caused by the offending conduct; and
3) which is capable of being redressed by a favorable court
decision.  Id.  The inquiry here focuses on the injury-in-fact
prong, because if Plaintiff can establish that she has suffered
such an injury, it is undisputed that the injury has been caused
by the presence of the Prayer Mural at her school, and will be
ameliorated by its removal or alteration.

In his concurring opinion in Lujan v. Defenders of Wildlife,
Justice Kennedy elaborated on the 'injury-in-fact' requirement,
stating that a plaintiff must:

> ...demonstrate a personal stake in the
> outcome. ...Abstract injury is not enough.
> The plaintiff must show that he has sustained
> or is immediately in danger of sustaining
> some direct injury as the result of the
> challenged official conduct and the injury or
> threat of injury must be both real and
> immediate, not conjectural or hypothetical.

504 U.S. at 579, 112 S.Ct. at 2146 (internal quotations and
citations omitted).  All of these terms, such as "personal
stake," "abstract injury" or "direct injury," are subject to
varying interpretations, and those differences in interpretation
are readily apparent in the divisive decisions that comprise the
Supreme Court jurisprudence on standing.  Rather than 'cherry
pick' phrases from the Supreme Court cases and try to match
Plaintiff's plight to the phrase, the analysis is better served
by an examination of the specific factual circumstances of

-20-

several Supreme Court cases, and a comparison of the facts where the Court determined that standing was present with those where it was not.

In Lujan, plaintiffs were wildlife conservationists concerned about the Department of the Interior's amended regulations that rolled back a requirement that it review the impact of its construction projects on endangered wildlife species.  The proposed amendment concerned construction projects funded by the U.S. government, but located in foreign countries.  Plaintiffs testified that they had traveled, and hoped to travel again, to countries where U.S. government-funded projects were damaging wildlife habitats.  A majority of the justices concluded that plaintiffs failed to demonstrate sufficient personal stake in the issue to establish standing.  Three of those in the majority concluded that the plaintiffs' more serious standing problem was the lack of redressability, because the previously-required regulation (even if reinstated) would not have ensured the survival of the threatened species.  Two dissenters concluded that plaintiffs had successfully demonstrated all the requirements to establish standing.  Id.

In Elk Grove Unified School District v. Newdow, 542 U.S. 1, 124 S.Ct. 2301 (2004), Plaintiff, an atheist, complained about his daughter having to recite the Pledge of Allegiance each day in school because its text contains the phrase "under God."  The

Supreme Court concluded that he lacked proper Next Friend
standing after his ex-wife filed a motion to intervene, stating
that she had exclusive legal custody over the girl and that
neither she nor the child had any objection to the Pledge.  Id.
at 15, 124 S.Ct. at 2311.

In Valley Forge Christian College, cited above, the Supreme
Court, in a five-to-four decision, concluded that plaintiffs
lacked standing to object to the federal government's transfer of
land, previously a military installation, to a bible college.
Plaintiffs claimed taxpayer standing, arguing that the
Establishment Clause was violated when their taxes were expended
in a way that would benefit the religious school.  Following a
line of cases which stand for the proposition that "the
expenditure of public funds in an allegedly unconstitutional
manner is not an injury sufficient to confer standing, even
though the plaintiff contributes to the public coffers as a
taxpayer," 454 U.S. at 477, 102 S.Ct. at 761, five justices
concluded that plaintiffs lacked taxpayer standing, as well as
any other grounds to object to the government's conduct, "other
than the psychological consequence presumably produced by
observation of conduct with which one disagrees."  Id. at 485,
102 S.Ct. at 765.  In response to plaintiffs' argument that they
had a spiritual stake in First Amendment values, the Supreme
Court, in a footnote, distinguished one of its several school

-22-

prayer cases, reproaching plaintiffs for taking the "spiritual stake" language out of context:

> First, the language cannot be read apart from the context of its accompanying reference to <u>Abington School District v. Schempp</u>.  In <u>Schempp</u>, the Court invalidated laws that required Bible reading in the public schools.  Plaintiffs were children who attended the schools in question, and their parents.  The [<u>Schempp</u>] Court noted:
>> "It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain.... The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed.  These interests surely suffice to give the parties standing to complain."
> ...The plaintiffs in <u>Schempp</u> had standing, not because their complaint rested on the Establishment Clause – for as <u>Doremus</u> demonstrated, that is insufficient – but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them.  Respondents have alleged no comparable injury.

454 U.S. 486 n. 22, 102 S.Ct. 766 n. 22 (internal citations omitted).

In the many cases where the Supreme Court has addressed school prayer, or bible-reading as in <u>Abington School District v. Schempp</u> (distinguished by the <u>Valley Forge</u> Court, above), it has nearly always determined that the plaintiffs' standing was valid, either expressly, or implicitly by proceeding to the merits of the dispute with no discussion of standing.  In none of these

cases does the Court discuss the feelings or statements of the students involved or question whether or not the students were truly upset by the prayers.

In Abington School District v. Schempp, two families brought suits against their childrens' public school districts to challenge the practice of daily bible readings in school.  374 U.S. 203, 83 S.Ct. 1560 (1963).  The Schempp Court jumped right into its Establishment Clause analysis, pausing only to mention in a footnote that "It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain."  Id. at 224 fn. 9, 83 S.Ct. at 1572 fn. 9. The Court continues with the language previously quoted above in Valley Forge that the interests of the schoolchildren and their parents "surely suffice to give the parties standing" because they are "directly affected by the laws and practices against which their complaints are directed." Id.

In Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261 (1962), the parents of ten public school children sued their school district over the daily recitation of a prayer drafted by the New York State Board of Regents.  Standing is not mentioned by the Court; it is assumed.  In Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649 (1992), a Rhode Island father brought suit objecting to the inclusion of prayer in a public school graduation ceremony. Weisman asserted taxpayer standing as well as Next Friend

-24-

standing on behalf of his daughter.  The Court wrote,

> We find it unnecessary to address Daniel
> Weisman's taxpayer standing, for a live and
> justiciable controversy is before us.
> Deborah Weisman is enrolled as a student at
> Classical High School in Providence and from
> the record it appears likely, if not certain,
> that an invocation and benediction will be
> conducted at her high school graduation.

Id. at 584, 112 S.Ct. at 2654.

    This Court is satisfied that the Supreme Court, were it to
analyze Plaintiff's standing herein, would determine that her
status as a student enrolled at Cranston West is sufficient to
confer standing in a dispute about a prayer displayed at her
school.  Like the student in Lee v. Weisman, she is a captive
audience.  Beyond that, Plaintiff has stated that the presence of
a Christian prayer on the wall of her school has made her feel
ostracized and out of place.  She has also stated that she
doesn't find the text of the Prayer to be offensive.  The Court
fails to find these statements inconsistent.  It is possible to
object to the presence of the Prayer Mural without having to find
its goals of academic achievement and good sportsmanship
offensive.  While her injuries might be characterized as
abstract, those injuries are consistent with the injuries
complained of by other plaintiffs in Establishment Clause
litigation, such as Engel v. Vitale and the Schempp case, and
readily distinguishable from the cases where the Supreme Court

-25-

has determined that plaintiffs lacked standing, such as <u>Lujan</u>,
<u>Valley Forge Christian College</u>, and <u>Elk Grove Unified School
District v. Newdow</u>.

## II.   **The Constitutionality of the Prayer Mural**

Having determined that Plaintiff has standing to bring her
lawsuit, it remains for the Court to explain why her challenge
prevails.  The Establishment Clause of the First Amendment of the
U.S. Constitution requires that "Congress shall make no law
respecting an establishment of religion..."  This mandate was
extended to the states with the enactment of the Fourteenth
Amendment.  Though the words are simple, their application to the
circumstances of our evolving nation has been complex and
contentious.  The guiding principle of Establishment Clause
jurisprudence has been government neutrality.  In <u>McCreary County
v. ACLU</u>, the Supreme Court wrote:

> The touchstone for our analysis is the
> principle that the First Amendment mandates
> governmental neutrality between religion and
> religion, and between religion and
> nonreligion.  When the government acts with
> the ostensible and predominant purpose of
> advancing religion, it violates that central
> Establishment Clause value of official
> religious neutrality, there being no
> neutrality when the government's ostensible
> object is to take sides.

545 U.S. 844, 860, 125 S.Ct. 2722, 2733 (2005) (internal
quotations and citations omitted).

Notwithstanding its commitment to neutrality, the Supreme

Court has been divided about the outcomes of disputes,[4] as well as about the proper analytic tools used to arrive at those outcomes.[5] In Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111 (1971), the Supreme Court set forth a three-part test for Establishment Clause cases; however, in subsequent cases the Court has at times criticized the Lemon test, describing its factors as "signposts," Hunt v. McNair, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873 (1973), or "considerations," McCreary County, 545 U.S. at 859, 125 S.Ct. at 2732.

Fortunately, the First Circuit recently analyzed an Establishment Clause dispute, Freedom From Religion Foundation v. Hanover School District, 626 F.3d 1 (1st Cir. 2010), and has provided a clear analytical framework for this Court to follow. In the Freedom From Religion case, which addressed the "under God" portion of the Pledge of Allegiance, the First Circuit explained the "three interrelated analytical approaches" articulated by the Supreme Court, including the three-prong Lemon "analysis," as well as:

> [t]he "endorsement" analysis, first
> articulated by Justice O'Connor in her
> concurrence in Lynch v. Donnelly, 465 U.S.

---

[4] See Van Orden v. Perry, 545 U.S. 677, 125 S.Ct. 2584 (2005), and McCreary County, both announced on the same day, with one upholding and one prohibiting displays of the Ten Commandments.

[5] See Chief Justice Rehnquist's dismissal of the Lemon test in Van Orden, 545 U.S. at 686, 125 S.Ct. at 2861.

> 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604
> (1984), and applied by a majority of the
> Court in County of Allegheny v. ACLU, 492
> U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472
> (1989); and the "coercion" analysis of Lee v.
> Weisman, 505 U.S. 577, 587, 112 S.Ct. 2649,
> 120 L.Ed.2d 467 (1992).

626 F.3d at 7.  In Freedom from Religion, the First Circuit

proceeded to measure the circumstances before it against each one

of these approaches.  This Court will do the same.

### The Lemon test

According to the Lemon v. Kurtzman analysis, a governmental

practice, or legislative act, must satisfy three tests in order

to survive an Establishment Clause challenge.  It must: "(1)

reflect a clearly secular purpose; (2) have a primary effect that

neither advances nor inhibits religion; and (3) it must avoid

excessive government entanglement with religion."  Lee v.

Weisman, 505 U.S. 577, 585, 112 S.Ct. 2649, 2654.

To examine the secular-ness of Cranston West's Prayer Mural,

one must reflect upon almost fifty years of history.  The

purposes of the Prayer, when drafted, and the Prayer Mural, when

installed, were clearly religious in nature.  David Bradley was

assigned the task of authoring the School Prayer in 1959, prior

to the Supreme Court's 1962 decision in Engel v. Vitale finding

daily prayer recitations in public school constitutionally

impermissible.  Soon after, Cranston West ended the recitation of

prayer, but the School Prayer was memorialized in the form of the

Prayer Mural.

No amount of debate can make the School Prayer anything other than a prayer, and a Christian one at that.  Its opening, calling upon the "Heavenly Father," is an exclusively Christian formulation of a monotheistic deity, leaving out, *inter alia*, Jews, Muslims, Hindus, Buddhists, and atheists alike.  The Prayer concludes with the indisputably religious closing: "Amen;" a Hebrew word used by Jews, Christians and Muslims to conclude prayers.  In between, the Prayer espouses values of honesty, kindness, friendship and sportsmanship.  While these goals are commendable, the reliance on God's intervention as the way to achieve those goals is not consistent with a secular purpose. Nonetheless, the Prayer Mural has hung on the auditorium wall for the last forty-six-odd years, all the while taking on the mantel of history and tradition.

To determine the present purpose of the Prayer Mural, it is necessary to examine the School Committee's motivations and its March 2011 vote to defend the Mural.  While the tenor of the School Committee's open meeting at times resembled a religious revival, the reasons articulated by the four School Committee members who voted to keep the Prayer Mural up, even in the face of anticipated litigation, were nuanced and varied.  Two Committee members were clearly motivated by their adherence to strong Catholic religious beliefs.  Other reasons cited for

-29-

keeping the Prayer Mural included the importance of conveying moral values to high school students; the importance of history and tradition to Cranston West; the importance of respecting each student's contribution to the school; and the importance to these elected officials of responding to their constituency.  The Court refrains from second-guessing the expressed motives of the Committee members, but nonetheless must point out that tradition is a murky and dangerous bog.  While all agree that some traditions should be honored, others must be put to rest as our national values and notions of tolerance and diversity evolve. At any rate, no amount of history and tradition can cure a constitutional infraction.  The Court concludes that Cranston's purposes in installing and, more recently, voting to retain the Prayer Mural are not clearly secular.  Other less ambiguous constitutional problems with the Prayer Mural reveal themselves through the analysis of <u>Lemon</u>'s other prongs.

<u>Lemon</u>'s second prong prohibits government action that has a primary effect of advancing or hindering religion.  To the extent the installation, 46-year-long maintenance and March 2011 endorsement of the Prayer Mural has an effect, its impact is to advance religion.  The Prayer Mural espouses important moral values, yet it does so in the context of religious supplication. The retention of the Prayer Mural is no doubt a nod to Cranston West's tradition and history, yet that nod reflects the nostalgia

felt by some members of the community who remember fondly when the community was sufficiently homogeneous that the religion of its majority could be practiced in public schools with impunity.

The third prong of <u>Lemon</u> requires that the government action "avoid excessive entanglement with religion." <u>Weisman</u>, 505 U.S. at 585, 112 S.Ct. at 2654.  It is on this prong that Cranston West's Prayer Mural reveals its most troubling aspect.  The Cranston School Committee and its subcommittee held four open meetings to consider the fate of the Mural.  At those meetings a significantly lopsided majority of the speakers spoke passionately, and in religious terms, in favor of retaining the Prayer Mural.  Various speakers read from the bible, spoke about their personal religious convictions, threatened Plaintiff with damnation on Judgment Day and suggested that she will go to hell.

The atmosphere was such that the Superintendent of Schools felt compelled to discuss his own religious beliefs at length when he made his recommendation to the Committee that they vote to retain the Prayer Mural.  Similarly, five of the seven School Committee members expressed avowals of their own religious beliefs at the meeting, including two of those who voted against retaining the Mural.  This is precisely the sort of "civic divisiveness," <u>McCreary County</u>, 545 U.S. at 876, 125 S.Ct. at 2742, that the Supreme Court's Establishment Clause cases repeatedly warn against.  For example, the <u>Engel</u> Court wrote:

-31-

> By the time of the adoption of the
> Constitution, our history shows that there
> was widespread awareness among many Americans
> of the dangers of a union of Church and
> State.  These people knew, some of them from
> bitter personal experience, that one of the
> greatest dangers to the freedom of the
> individual to worship in his own way lay in
> the Government's placing its official stamp
> of approval upon one particular kind of
> prayer or one particular form of religious
> services. ... The Constitution was intended
> to avert a part of this danger by leaving the
> government of this country in the hands of
> the people rather than in the hands of any
> monarch.  But this safeguard was not enough.
> Our Founders were no more willing to let the
> content of their prayers and their privilege
> of praying whenever they pleased be
> influenced by the ballot box than they were
> to let these vital matters of personal
> conscience depend upon the succession of
> monarchs.

370 U.S. at 429, 82 S.Ct. at 1266.  See also Lemon, 403 U.S. at
622, 91 S.Ct. at 2116 (..."political divisions along religious
lines was one of the principal evils against which the First
Amendment was intended to protect.") When focused on the Prayer
Mural, the activities and agenda of the Cranston School Committee
became excessively entangled with religion, exposing the
Committee to a situation where a loud and passionate majority
encouraged it to vote to override the constitutional rights of a
minority.

### *The endorsement test*

Pursuant to the endorsement analysis, the Court must
determine if the actions of the Cranston School Committee have

the "purpose or effect of endorsing, favoring, or promoting

religion." Freedom From Religion Foundation, 626 F.3d at 10.

The Government must not appear to take sides on issues of

religious beliefs.  In Santa Fe Independent School District v.

Doe, a case involving prayer at public high school football

games, the Supreme Court wrote:

> School sponsorship of a religious message is
> impermissible because it sends the ancillary
> message to members of the audience who are
> nonadherents "that they are outsiders, not
> full members of the political community, and
> an accompanying message to adherents that
> they are insiders, favored members of the
> political community."

530 U.S. 290, 309-10, 120 S.Ct. 2266, 2279 (2000) (quoting Lynch

v. Donnelly, 465 U.S. 668, 688, 104 S.Ct. 1355, 1367 (1984)).

It is incontestable that at the end of the lengthy School

Committee meeting on March 7, 2011, those in support of the

Prayer Mural believed that they had won the day, and that

Plaintiff and her few friends were the losers.  A similar message

was conveyed to Plaintiff when Mayor Fung told the students

assembled at Cranston West for Diversity Day that the Prayer

Mural should stay.  While Plaintiff recalls feeling ostracized

and alone, the constitutionality of the Prayer Mural turns not on

Plaintiff's feelings, but rather on the Court's assessment of how

a reasonable and objective observer, fully aware of the

background and circumstances, would view the Prayer Mural and the

conduct of the School Committee.   <u>Freedom from Religion</u>

<u>Foundation</u>, 626 F.3d at 11.

Again, to perform this analysis, the Court must examine the Prayer Mural at three points in time.  When the Prayer Mural was hung in 1963, a reasonable observer would no doubt have concluded that Cranston West endorsed its message, and approved its installation in a place of prominence in the new auditorium. While the Prayer was authored by a student, and the Mural was paid for by a group of graduates, the School would never have permitted the exhibition of a message of which it did not approve.  During the forty-five-plus years that the Prayer Mural has hung in the auditorium, an observer would probably have been puzzled by the Prayer Mural.  Clearly it is "old-looking" as Committee member Lombardi observed, and yet it is still maintained and located in a place of honor to the right of the stage, next to the clock.  However, if that puzzled observer had sat in on the March 7, 2011, School Committee meeting, his or her confusion would have ended.  At that meeting, the School Committee endorsed the position of those who believe that it is acceptable to use Christian prayer to instill values in public schoolchildren; a decision that clearly placed the 'nonadherents' outside of the political community.

### *The coercion analysis*

The final test employed by the First Circuit in the <u>Freedom</u>

from Religion case is referred to as the "coercion analysis."

In Lee v. Weisman, the Supreme Court refrained from relying on

Lemon, because, as the Court wrote, the government's involvement

with religious activity was so pervasive that the analysis was

unnecessary.  505 U.S. 587, 112 S.Ct. 2655.  A Rhode Island case,

Weisman involved the inclusion of prayer at the graduation

ceremony at Classical High School in Providence.  Although it was

possible for a student to graduate without attending the

ceremony, and it was possible to attend the ceremony without

participating in the prayer, the Court found that there was

"subtle coercive pressure" to participate, particularly in the

setting of a school activity.

> What to most believers may seem nothing more
> than a reasonable request that the
> nonbeliever respect their religious
> practices, in a school context may appear to
> the nonbeliever or dissenter to be an attempt
> to employ the machinery of the State to
> enforce a religious orthodoxy.

Id. at 592, 112 S.Ct. at 2658.  Both the Freedom from Religion

case and Weisman involve public schoolchildren, where the Supreme

Court has always demonstrated a heightened sensitivity to any

perceived coercive pressure.  See Schempp, 374 U.S. at 230, 83

S.Ct. 1576 (... "constitutional prohibitions encounter their

severest test when they are sought to be applied in the

classroom.")  Applying the coercion analysis to the present

dispute, the Court determines that any coercive pressure exerted

by the sight of the Prayer Mural on the wall would have been subtle indeed. Nonetheless, the high school setting in the present case does invoke the highest scrutiny employed by the Supreme Court in Establishment Clause cases.

### *Public schools*

The Supreme Court has traditionally drawn a clear line between government conduct which might be acceptable in some settings and the conduct which is prohibited in public schools. In Van Orden, where the Supreme Court held that a monument displaying the Ten Commandments was acceptable on the 44-acre grounds of the Texas State Capitol, the Court underscored this distinction:

> This case, moreover, is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state.

545 U.S. at 703, 125 S.Ct. at 2871. The Court elaborated on its concerns in Weisman, explaining the impact on high school students that can be exerted through peer pressure, public pressure and the effect of the opinions of respected teachers and administrators. 505 U.S. at 593, 112 S.Ct. at 2658. In Edwards v. Aguillard, which struck down Louisiana's creation science curriculum, the Supreme Court wrote:

> The Court has been particularly vigilant in
> monitoring compliance with the Establishment
> Clause in elementary and secondary schools.
> Families entrust public schools with the
> education of their children, but condition
> their trust on the understanding that the
> classroom will not purposely be used to
> advance religious views that may conflict
> with the private beliefs of the student and
> his or her family.  Students in such
> institutions are impressionable and their
> attendance is involuntary.

482 U.S. 578, 583-84, 107 S.Ct. 2573, 2577 (1987).

The Supreme Court case with facts most directly on all fours with the Cranston dispute is Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192 (1980).  In that case, plaintiffs challenged a Kentucky statute that required schools to post copies of the Ten Commandments on the wall of every public school classroom.  The statute specified that the copies would be purchased with private donations.  Id. at 41, 101 S.Ct. at 193.  The school district defended the statute, arguing that the purposes of the statute were "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature."  Id. at 41, 101 S.Ct. at 194.  Employing the Lemon test, the Stone Court concluded that the primary purpose of posting the Ten Commandments was "plainly religious," and "no legislative recitation of a supposed secular purpose can blind us to that fact."  Id. at 41, 101 S.Ct. at 194.  The Stone Court also

-37-

concluded that no educational purpose would be attained with the posted text:

> If the posted copies of the Ten Commandments
> are to have any effect at all, it will be to
> induce the schoolchildren to read, meditate
> upon, perhaps to venerate and obey, the
> Commandments.  However desirable this might
> be as a matter of private devotion, it is not
> a permissible state objective under the
> Establishment Clause.

Id. at 42, 101 S.Ct. at 194.  The holding in <u>Stone v. Graham</u> compels this Court's ruling herein.

### *"There goes many a ship to sea..."*

It remains for this Court to attempt to soothe those who may believe that this decision represents a harsh result over a minor Constitutional infraction.   The Supreme Court offers two pertinent lessons.  First, the Supreme Court urges us to remember that "insistence upon neutrality, vital as it surely is for untrammeled religious liberty, may appear to border upon religious hostility. But in the long view the independence of both church and state in their respective spheres will be better served by close adherence to the neutrality principle."  <u>Schempp</u>, 374 U.S. at 246. 83 S.Ct. at 1584.  Second, later in the same opinion, the Supreme Court addresses the circumstance in <u>Engel</u>, where, as here, the complaints of a few overcame the beliefs and desires of the majority: "Nor did it matter that few children had complained of the practice, for the measure of the seriousness of

a breach of the Establishment Clause has never been thought to be the number of people who complain of it." Id. at 264, 83 S.Ct. at 1594.  Plaintiff is clearly an articulate and courageous young woman, who took a brave stand, particularly in light of the hostile response she has received from her community.

Over the many years of its history, the Supreme Court has turned to the words of the Founding Fathers and the framers of the Constitution to support varying interpretations of the Establishment Clause.  Many chapters have been devoted to Thomas Jefferson, James Madison, George Washington and even Abraham Lincoln, and what their expectations were for the public religious practices of this nation.  This Court has tried to resist the temptation of injecting lofty rhetoric into this opinion, but nonetheless was moved by the words, as quoted in Schempp, of Roger Williams, the founder of our state, who left the Massachusetts Bay Colony in pursuit of religious liberty.

> There goes many a ship to sea, with many hundred souls in one ship, whose weal and woe is common, and is a true picture of a commonwealth, or human combination, or society.  It hath fallen out sometimes, that both Papists and Protestants, Jews and Turks, may be embarked on one ship; upon which supposal, I affirm that all the liberty of conscience I ever pleaded for, turns upon these two hinges, that none of the Papists, Protestants, Jews, or Turks be forced to come to the ship's prayers or worship, nor compelled from their own particular prayers or worship, if they practice any.

Id. at 214 n. 6, 83 S.Ct. at 1567 n. 6.

## Conclusion

For all these reasons, this Court grants Plaintiff's motion for a mandatory permanent injunction, and orders the immediate removal of the School Prayer mural from Cranston High School West.  The Plaintiff, as the prevailing party, is given twenty days from the date hereof to file for counsel fees and costs. Defendants shall have ten days after Plaintiff's filing to respond.  This Court will enter judgment after these issues are resolved.  It is so ordered.

/s/Ronald R. Laqueux
Ronald R. Lagueux
Senior United States District Judge
January  11, 2012