IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CIVIL ACTION
MARK AHLQUIST, et al     *   11-138
                         *
VS.                      *   OCTOBER 13, 2011
                         *
CITY OF CRANSTON, et al  *   PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE RONALD R. LAGUEUX

SENIOR DISTRICT JUDGE

(Bench Trial)


<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:        LYNETTE J. LABINGER, ATTY.
                           Roney & Labinger LLP
                           344 Wickenden St.
                           Providence, RI  02903

FOR THE DEFENDANTS:        JOSEPH V. CAVANAGH, JR.,
                           ESQ., and JOSEPH V. CAVANAGH,
                           III, ESQ.
                           Blish & Cavanagh, LLP
                           30 Exchange Terrace
                           Providence, RI  02903

Court Reporter:            Anne M. Clayton, RPR
                           One Exchange Terrace
                           Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

1    13 OCTOBER 2011 -- 2:00 P.M.

2        THE COURT:  Good afternoon, everyone.  The case

3    before the Court is Civil Action 11-138L, Mark Ahlquist

4    as next friend, parent and guardian of J.A., a minor

5    versus the City of Cranston, by and through Robert F.

6    Strom, in his capacity as Director of Finance; and by

7    and through the School Committee of the City of

8    Cranston and the School Committee of the City of

9    Cranston, by and through Andrea Iannazzi, in her

10    capacity as Chair of the School Committee of the City

11    of Cranston.  It's quite a mouthful.

12        Will the attorneys identify themselves for the

13    record, please.

14        MS. LABINGER:  Your Honor, Lynette Labinger,

15    Roney and Labinger, for the Plaintiffs, Mark Ahlquist

16    and the minor.

17        And could I just say that, unless the Court

18    insists on it, we waive the obligation to redact the

19    minor's name.  Everyone knows who she is, and it's just

20    becoming --

21        THE COURT:  So anybody who reads the Providence

22    Journal knows it's Jennifer Ahlquist?

23        MS. LABINGER:  Jessica Ahlquist.

24        THE COURT:  Is it Jennifer?

25        MS. LABINGER:  Jessica Ahlquist.

1          THE COURT:  Jessica Ahlquist.

2          MS. LABINGER:  Yes.  We ask for leave not to

3     have to redact her name.  We don't have a problem

4     redacting other minors' names, but it will save us a

5     lot of time.

6          THE COURT:  All right.

7          MS. LABINGER:  Thank you.

8          MR. CAVANAGH, JR.:  Joseph V. Cavanagh from

9     Blish and Cavanagh for the Defendant.

10          MR. CAVANAGH, III:  Joseph Cavanagh, III, from

11     Blish and Cavanagh for the Defendant.

12          MS. WINDHAM:  Lori Windham with The Becket Fund

13     for Religious Liberty for the Defendants.

14          THE COURT:  All right.  As I sent word to the

15     attorneys yesterday, through my law clerk, I think this

16     is the kind of case that's important for the Court to

17     take a view of the area of Cranston West in general and

18     the auditorium in particular.  So I'm not waiting for

19     the lawyers to make a motion for a view, which is the

20     normal event.  I'm going to do it sua sponte.  Of

21     course, the view is not evidence.  The purpose of a

22     view is to aid the fact finder or fact finders to

23     better understand the evidence.  And it's particularly

24     important in this case because we have a record in this

25     case.  Unlike an appellate judge, I'm going to read a

1    record.  There will not be any live testimony.

2          When I hear a non-jury case generally when

3    there's a witness on the stand and there's something I

4    don't quite understand, I ask questions myself to get

5    clarification.  I won't have that pleasure in this

6    case, so I think it's important that I have a view so I

7    understand when I'm reading from a cold record what the

8    context might well be.  So that's why I am ordering sua

9    sponte the taking of a view.  We're going to take it

10   now this afternoon, and then we'll return here and

11   we'll have this book of exhibits marked, and they're

12   all original exhibits.  Those are the exhibits that I

13   will read.  I haven't read those yet.  I was waiting to

14   read -- I've read the briefs several times, each brief

15   several times.

16         And so we will recess to take a view.  I think

17   we'll probably be back here around three o'clock to

18   start arguments.  I don't like to restrict lawyers in

19   their arguments but we're going to be pressed for time

20   this afternoon so the Plaintiffs' side will argue

21   first, one hour.  Defendants' side will argue second,

22   one hour.  And then I'll give the Plaintiffs' side 20

23   minutes for rebuttal and that will complete the

24   arguments in the case and I, of course, will take this

25   case under advisement and write an opinion later.  Are

1     there any questions?

2              MR. CAVANAGH, JR.:  No.

3              MS. LABINGER:  No, your Honor.

4              THE COURT:  All right.  I'm going to the view

5     with a U.S. marshal and my deputy clerk here and my law

6     clerk, and I presume all of you have transportation to

7     go there.

8              MR. CAVANAGH, JR.:  Should we meet you outside

9     the high school at the steps?

10             THE COURT:  Yes.  Why don't we do that.  See you

11    on the view.

12             (Recess taken from 2:10 p.m. to 3:15 p.m.)

13             THE COURT:  First order of business is what to

14    do with all these exhibits.  These are all the original

15    exhibits in this binder, right?

16             MR. CAVANAGH, JR.:  Yes, your Honor.

17             THE COURT:  How should we mark it?  Should we

18    just mark it joint exhibits and have the clerk sign it

19    and so that this is the official exhibits of the case?

20             MS. LABINGER:  Your Honor, we submitted an

21    exhibit list, which provided in sequential order which

22    ones were joint exhibits, which ones were Plaintiffs'

23    exhibits, and which ones were defense exhibits.  A

24    substantial number are joint exhibits.  I believe you

25    should have a list that has numbers 1 through 36.  Some

1    of them have subparts.  Exhibits 1 through 14 are joint

2    exhibits.  Plaintiffs' exhibits are marked 15 through

3    22 and 32 and 33.  That's because we submitted a couple

4    extra exhibits when we filed our reply.

5         The Defendants' exhibits were 23 through 31 and

6    34 through 36.  For ease of everyone's briefing, we

7    agreed to number them sequentially so that we didn't

8    have ones and A's.  I know that there are a number of

9    subparts, and they are also identified in the exhibit

10   list.  I don't believe that the Plaintiff has any

11   objections to Defendants' exhibits.  The only thing

12   that I would observe is that the declaration of

13   Reverend Dr. Anderson, which is Exhibit 18, is a copy.

14   I have the original if it's necessary to have his

15   original signature.  There's a photocopy with the

16   signature in your file now, and I leave that to my

17   colleagues as to whether that's sufficient.

18        MR. CAVANAGH, JR.:  That's not necessary to have

19   the original; however, I do have an objection to that

20   exhibit that I'll argue to you when she's finished.

21        THE COURT:  I thought these were all agreed

22   upon.

23        MS. LABINGER:  I don't think there's any

24   question about authenticity.

25        MR. CAVANAGH, JR.:  No.  Right.  On 18, your

1    Honor, it's relevance, and I'd offer that to you for

2    that reason.  And also we think his opinion is

3    something from an expert that the Court does not need

4    under these circumstances.  That's our grounds for

5    number 18.

6         THE COURT:  Well, I'm not going to deal with

7    that now.  Leave that list with the clerk so she can

8    mark it on top of this and with the signature these are

9    the official exhibits of the Court with a reservation

10   on 18.

11        MR. CAVANAGH, JR.:  Right.  And for the record,

12   they have exhibits relating to the Hugh B. Bain Middle

13   School.  That's Exhibit 21A, B and C and Exhibit 22.

14   My objection to that is relevance.  They are irrelevant

15   under these circumstances, and these are my objections.

16   So 18 it's on relevance grounds, and it's an opinion

17   that you don't need sitting as the Court; and 21 and 22

18   it's relevance of those exhibits.

19        MS. LABINGER:  And your Honor, we have addressed

20   the issue of the relevance of the Bane exhibits, and we

21   would ask that since you're sitting without a jury

22   since there's no question about authenticity that you

23   accept them all and that as you decide this case you

24   can determine how much --

25        THE COURT:  This is a non-jury case so I'll

1    accept them all as full exhibits, and I'll determine

2    the weight of them.

3            MS. LABINGER:  Thank you.

4            There may be an exhibit list there, but I have

5    another copy of it if I can bring it forward.

6            THE COURT:  All right.  The clerk will mark that

7    binder as -- based on the list you've given us.

8            All right.  I'm ready to hear final arguments.

9            Ms. Labinger will argue first.

10           MS. LABINGER:  Thank you.  Your Honor, I want to

11   start by thanking you for graciously agreeing to give

12   me an hour for argument.  I, respectfully, will not be

13   taking an hour of time.

14           In this matter, we filed a memorandum in support

15   of our motion for preliminary injunction.  We also

16   followed up with a fairly substantial brief.  Our

17   opening brief, which I think is Document 18, in support

18   of our application for injunctive and declaratory

19   relief and damages have been stipulated if the Court

20   finds liability in this matter.

21           And we also submitted a fairly lengthy reply

22   memorandum.  I am pretty much talked out, so I will not

23   take a whole hour, or anywhere near that, unless the

24   Court has a lot of questions.

25           THE COURT:  You can assume that I've read these

1    briefs very thoroughly so you can hit the high spots.

2         MS. LABINGER:  Well, I spent a lot of time on

3    them as did my brother, co-counsel, Mr. Bender, who is

4    not here today, and I do want to state as I've advised

5    our client that he will be withdrawing from the case.

6    He's leaving his current law firm and will be the chief

7    appellate counsel for the Rhode Island Public Defender

8    in a few more weeks and is no longer able to

9    participate.  That's the only reason he will be

10   withdrawing, but I did want to alert the Court as to

11   why he's not here.  And he was a major contributor in

12   our arguments in every step of the way.

13        I think the parties have given a great

14   explication on their respective positions on the state

15   of the law on establishment clauses.  This is an

16   Establishment Clause case exclusively.  I would point

17   out that the exhibits consist of deposition transcripts

18   from which the parties have in their own respects

19   developed what they believe is the history of the

20   creation of the school prayer, which you saw today; the

21   creation -- the composition of the text, which was the

22   result of a student council being tasked at the early

23   days of Cranston High School West to develop key items

24   for this new school, a school prayer; a school creed;

25   colors, which I think are red and gray; a school

1    mascot, which is the Falcons.  And this was composed in

2    1960; and once it was composed, the school, instead of

3    having daily recitation of the Lord's Prayer, which

4    everyone pointed out was the Catholic version, and I --

5         THE COURT:  Was the Lord's Prayer actually

6    recited at Cranston West at any time?

7         MS. LABINGER:  Yes.  Yes.  The evidence is that

8    in the early days before the School Prayer was

9    composed, every day they would recite the Lord's

10   Prayer, the Catholic version.

11        THE COURT:  In every class?

12        MS. LABINGER:  Yes.  It was either led by the

13   homeroom in the homeroom or once they got the public

14   address system, then someone would lead it, a student

15   over public address.  And the evidence is clear that

16   once the School Prayer was composed and approved as the

17   School Prayer of Cranston West, they started reciting

18   the School Prayer, the one you saw on the wall today,

19   instead of the Lord's Prayer.  And there's some

20   question between the parties as to whether the School

21   Prayer was ever recited once it was affixed to the

22   auditorium wall.  The Defendants claim that it was not.

23   We submitted some evidence from a high school teacher

24   who later became a principal that it was recited on

25   occasion.  He could not have been confused about timing

1    because he wasn't there before 1964 when the auditorium

2    was there.  So -- but that just tells us about the

3    history.  We all agree that at some point they stopped

4    reciting the School Prayer, before Ms. Ahlquist got

5    there, many years beforehand.

6        The evidence is very clear that when the School

7    Prayer was originally composed and recited, there was

8    no auditorium.  In those days, Cranston West was a

9    junior and senior high school so for some classes they

10   went for well more than the three or four years that

11   one normally associates with high school.  They started

12   in junior high school.  And the building was built in

13   stages, and you saw today how the auditorium is a

14   stand-alone building.  It was built as a separate

15   module from the main area.  And it was built and opened

16   we're not quite sure but probably nineteen sixty --

17   either the fall of 1963 or sometime in 1964.  And the

18   reason we peg it as that, and I don't think there's a

19   material disagreement about it, is that the prayer and

20   creed, which are on the walls, were the gift of the

21   first graduating class which graduated in the spring of

22   1963.  And according to the testimony of the class

23   vice-president, Mr. Zito, there was no auditorium for

24   them to graduate from.  I think they went to the gym.

25       So they commissioned the School Prayer and the

1  School Creed to be designed, written out and affixed to

2  the newly under construction auditorium as a gift of

3  the first graduating class.  They didn't write it.

4  They didn't write the creed or the prayer.  They didn't

5  design it.  They certainly approved the designs as did

6  their faculty advisor and the principal and whoever

7  else was involved in the process, but they, under no

8  circumstances, is this a student-created work of art.

9  And one of the things that you will see when you review

10  the photographs of the Bane prayer and creed and

11  auditorium, which is -- we are not complaining about

12  it, we don't have standing, but it is important

13  evidence because the configuration, when you look at

14  them side by side, and we've attached this as an

15  appendix to our opening brief, the creed for Bane,

16  which the Defendants believe was on the wall in that

17  auditorium since the 1920's and also bears a little

18  notation on the bottom, gift -- I think it says, Class

19  of 1956.  The words of the two creeds --

20      THE COURT:  Excuse me.  Bane was a junior high

21  school.

22      MS. LABINGER:  I think it was originally a

23  junior high school.  Now it's a middle school.

24      THE COURT:  I see.

25      MS. LABINGER:  And the difference is one is 6, 7

1    and 8 and one is 6 and 7, and please don't ask me to be

2    definitive about which is which because I get confused,

3    but it is a middle school.  It is currently operating

4    in Cranston, and up until some weeks --

5          THE COURT:  The Bane students then go to West,

6    right?

7          MS. LABINGER:  They go to West or some other

8    high school, yes.  They're in the same general area, I

9    believe.  In fact, the first graduating class, the

10   Class of 1963, had come from Bane, which they had been

11   there for junior high school and had come in the 9th

12   grade to West instead of going to the old Cranston High

13   School, which had then been renamed Cranston East.  And

14   at Mr. Zito's deposition, he points out that he

15   expected to go to Cranston East, and I believe he said

16   he was expecting to play football there and was upset

17   that he got stuck at West, but they come from the same

18   geographic areas.  And the creed at Bane and the creed

19   at West with the exception of one refers to Bane and

20   the other refers to West, and I think there are six

21   words like "generously" and "as maintained" are --

22   they're verbatim.  Notwithstanding the fact that

23   Mr. Bradley, who was 13 when he composed the School

24   Prayer, claimed he wrote it himself, I think that was a

25   flight of fancy because it is almost word-for-word from

1    the Bane creed.

2          The prayers are different in text, but they both

3    start, "Our Heavenly Father."  They both are in the

4    form of prayers, help us, grant us, beseeching

5    requests.

6          The way they're styled, each creed has, I

7    believe, it's a bird clutching branches in its talons.

8    Each prayer, the Bane and the West prayer, have an urn

9    or a lamp with wings over an open book over stylized

10   mountains.  The only difference between them is that

11   one's in the Bane school colors and one is in the West

12   school colors.  They both have, when you're facing the

13   stage, it's not there at Bane anymore, but when you

14   face the Bane stage, the creed was on the left, the

15   prayer was on the right.

16         So this appears to have been some kind of a

17   tradition or a design of those two Cranston schools and

18   not something that was a creation, as the Defendants

19   are claiming, of student artwork.  They may have paid

20   for it to be painted and installed, but there's no

21   fingerprints of student artwork there anymore than as

22   you saw today when you saw the trophy cases and they

23   said "Gift of Class of 1997," that that trophy case

24   could be viewed as a work of a student-created art.

25         So the prayer and the creed were affixed to the

1   walls probably in 1963, '64.  Under the <u>Pleasant Grove</u>

2   case, upon acceptance and installation by the City of

3   Cranston and its public schools became

4   Government-sponsored speech.  Whether they were recited

5   for some period of time afterwards in assemblies, we

6   suggest they were, Defendants say they weren't, we all

7   agree that they stopped reciting them some time ago.

8   But they stayed up on the wall and the prayer is not,

9   as the Defendants would suggest, anything like a pledge

10  of allegiance, which in the **<u>Freedom From Religion</u>**

11  **<u>Foundation versus Hanover</u>** case was under consideration

12  by the First Circuit, the Plaintiffs in that case

13  conceded that the pledge of allegiance had a secular

14  purpose, being patriotism, a display of patriotism.

15      In contrast, this is a prayer.  It's always been

16  a religious message.  It's a religious communication,

17  and it's in a public school.  And we believe that the

18  case law is very clear that expressions of religion in

19  public schools by the school as an official statement

20  of the school runs afoul of the Establishment Clause.

21      THE COURT:  What's the strongest analogous case

22  that you have from the Supreme Court?

23      MS. LABINGER:  I think probably **<u>Stone versus</u>**

24  **<u>Graham</u>**, which struck down the posting of the Ten

25  Commandments in classrooms in public schools.  And in

1    that case, that's I think a 1980 case, the Supreme

2    Court rejected the school district's claim that it had

3    a secular purpose and they even had a plaque or

4    explanatory text to go with it.  A lot of the times

5    that the Ten Commandments issue comes up the claim is

6    that there's an analogy because Moses was the first law

7    giver and that somehow or another in the courtrooms or

8    other settings that it has some historic difference,

9    which, obviously, it does; but just the plain,

10   unadorned expression of posting of the Ten Commandments

11   was struck down by the Supreme Court, and they rejected

12   the school district's claim that it has a secular

13   purpose because it has an explanatory text.  The

14   Supreme Court said that they would look behind that.

15   That case is cited over and over again by the Supreme

16   Court.  It is good law.

17         The Van Orden case, which the Defendants rely

18   upon, was a plurality decision, four in favor.  Justice

19   Breyer providing the fifth vote to uphold the display,

20   and four dissenting.  And I believe Justice Breyer, I

21   think it was the same day, in McCreary joined the four

22   dissenters in Van Orden to strike down the posting of

23   the Ten Commandments in public courtrooms, and again

24   looks beyond and the Court refused to accept the

25   state's claim that there was an explanatory plaque or

1   explanatory reason and said, No, we find a sectarian or

2   religious purpose and effect.

3          So Justice Breyer in his decision providing the

4   one vote on plurality decision is viewed in Supreme

5   Court case precedent as the narrowest and controlled

6   decision.  And he made clear in that case that he

7   viewed it as a borderline case.  He was very clear that

8   he distinguished the placement of a monument, which

9   listed the Ten Commandments and started, I believe, "I

10  am the Lord thy God," and then listed all Ten

11  Commandments without any explanatory text, a big, big,

12  monument, that he felt that this was a borderline case;

13  and he was persuaded because this monument was one of

14  many scattered across 22 acres of public grounds of the

15  Texas Capitol and pointed out in his decision that he

16  distinguished it from what could be the case in public

17  schools.  And even the plurality, the four who he

18  joined, pointed out that public schools were different.

19         Our First Circuit in the <u>Freedom From Religion</u>

20  <u>Foundation</u> case pointed out in the Establishment Clause

21  area public schools are different.

22         So that you have the situation where you can

23  have a decision upholding a legislative session being

24  started with an invocation by a priest or a pastor in

25  <u>**Marsh versus Chambers**</u> as not a violation of the

1    Establishment Clause, but in **Lee versus Weisman**, a

2    holding out of -- that started here that having a rabbi

3    or member of the clergy provide an invocation or

4    benediction at a high school graduation violated --

5            THE COURT:  Junior high school.

6            MS. LABINGER:  What's that?

7            THE COURT:  Junior high school.  Nathan Bishop.

8            MS. LABINGER:  Well, technically, your Honor, if

9    I may, it happened at the junior high school, but it

10   actually -- there was no injunction, and that case

11   could have been moot except for the fact that

12   Ms. Weisman, who I think is in the courtroom today, was

13   going on to high school and what they -- and that gave

14   her standing to object to what she anticipated would

15   happen next, which was it was going to happen in high

16   school.

17           So I don't think that that case can be in any

18   way distinguished from our situation because it

19   involved a junior high school because, in fact, the

20   junior high school prayer had been done and what the

21   Court was focusing on in ruling in favor of the

22   Weismans was that it was going to happen again at the

23   high school level and that was a violation of the

24   Establishment Clause.  So --

25           THE COURT:  Was Judge Breyer on the Court at

1   that time, Justice Breyer?

2         MS. LABINGER:  I'm not quite sure.

3         THE COURT:  I don't think he was.

4         MS. LABINGER:  I don't think so.

5         Similarly, as I mentioned the distinction

6   between Van Orden upholding Ten Commandments in a big

7   public park and **Stone versus Graham** finding that it was

8   invalid to have the Ten Commandments displayed in

9   public classrooms.  There's no evidence of any

10  recitation of the Ten Commandments or any prayers along

11  with it.

12        There are other cases that we have cited in our

13  brief, the Santa Fe case involving I think it was

14  prayer before athletic events; the old standbys,

15  **Abington versus Schempp** and **Engel versus Vitale**

16  prohibiting the daily recitation of prayers in public

17  schools; McCreary case, which had to do with

18  courtrooms.  We believe that particularly because this

19  is a school setting the case law is clear that it

20  violates the Establishment Clause.

21        We certainly have gone through the very careful

22  analysis of the **Lemon versus Kurtzman** test to

23  demonstrate that there is a religious purpose and a

24  religious effect.

25        As I started by saying, these are not student

1    works of art.  There's no way they could be viewed as

2    such on a fair understanding of what happened in this

3    case.  They certainly -- the money and the items were

4    donated, but they weren't created by the students.

5    They were -- so they hired somebody.  They were put up

6    by the school where the school wanted them.  The city

7    says, well, maybe it wasn't the school, maybe it was

8    the architect, but the last time I looked the architect

9    is an agent of the city in designing and putting up a

10   school.  The city owns them, and the prayer is very

11   visible.

12        Notwithstanding how dark it was today, your

13   Honor, I don't know if you noticed but right next to

14   the prayer was a burnt-out light bulb that when it's

15   lit provides illumination right on the School Prayer.

16   There were a number of burnt out light bulbs, but it

17   was pretty dark there today.

18        THE COURT:  I was a little concerned about that.

19   There was very little lighting in the auditorium today.

20        MS. LABINGER:  That's true.  I was as well.  I

21   wonder whether that's a safety issue for people going

22   in and out.  But as you might have noticed, wherever

23   those banners are hung, and they're typically hung over

24   the light sconces, it seemed like every other one was

25   burnt out.  And it was -- I've been in there now three

1    times.  This was -- it was never -- I think the last

2    time I was there it may have been close to this dark

3    but this is as dark as I've seen it.  And that item,

4    the prayer is very big.  It's meant to be read.  It's

5    very visible.

6         I believe that the city has made two major

7    arguments in this matter.  One is that the Plaintiff

8    doesn't have standing, and the other is how to apply

9    the Establishment Clause precedent.

10        On the standing issue, as we pointed out in our

11   brief, we didn't find any cases where a school

12   department had basically gone after their own 15 or now

13   16-year-old kid and said that she's got the intestinal

14   fortitude, that she really doesn't care about this and

15   basically trying to cast her as a professional

16   litigant.  The evidence doesn't support that at all.

17   She is just a kid.  And when she -- unlike some kids,

18   she realized when she was at a pretty early age, ten or

19   so, that she did not believe in God.  And she pretty

20   much, except for her family, kept that to herself.  And

21   she didn't seek out this issue.  She didn't even know

22   there was a prayer in the school.  She goes to Cranston

23   West because she lives in the neighborhood.  It's her

24   public school.

25        Her first year there she was in the auditorium.

1    She didn't read it until towards the end of the first

2    year when a friend of hers pointed it out, said to her,

3    did you know there was a prayer in the auditorium.

4    Well, she went and read it.  And from that moment on,

5    as she's testified in her deposition, in her affidavit,

6    it took her back.  She was very upset.  It offended her

7    because, "What is a prayer doing in my school?  I don't

8    believe in God.  I feel left out."  And she has been --

9    said that throughout these proceedings.

10        As we've pointed out in our briefs and as the

11   exhibits will show you, there are many occasions that

12   high school students and now juniors, as she is a

13   junior, are required to attend programs in the

14   auditorium from the beginning of the year until the end

15   of the year.  And there are enrichment programs.

16   There's extra-curricular programs, there are

17   rehearsals, there are performances that the auditorium

18   is used for.

19        The Defendants suggest that in order for

20   Ms. Ahlquist to have standing, she has to avoid the

21   auditorium.  She has to deny herself the access to the

22   programs that are offered and in some respects required

23   in the auditorium or she does not have standing.  We

24   have briefed the issue, and I believe that we have

25   provided the Court with numerous cases which make clear

1    that there is no obligation to avoid in order to be

2    recognized to have standing, and we do not believe that

3    the Defendants have pointed out a case where that was

4    held.  There certainly were cases that they pointed out

5    where there might have been three Plaintiffs, two of

6    whom testified that they avoided whatever the

7    objectionable display or event was, and one who didn't.

8    And in those cases, the Court would say, well, we don't

9    need to get to that other issue because we have two who

10   avoid it.  But no court to our understanding has

11   actually held as Defendants argue that in order to have

12   standing one has to absent oneself from the offensive

13   display.  And that would be a remarkable position.  It

14   is a remarkable position for the school department to

15   take concerning its required events for this student,

16   that the price for her to avoid a display that the

17   school says is just an historic or piece of artwork is

18   that she should not go and not attend things with her

19   classmates, with her friends and further heighten the

20   isolation that she's already experiencing.  And we

21   submit that the case law does not support that and this

22   Court should not so hold.

23        The other thing that the Defendants argue is

24   that they have taken some statements that Ms. Ahlquist

25   made in social media or in interviews and said, A-ha,

1    she said the prayer doesn't offend me, or it's not

2    offensive, and that proves that notwithstanding that

3    she said in her deposition and in her affidavit that

4    she has always been offended by viewing the prayer and

5    it's always made her feel excluded, that this Court

6    should ignore her in-court statements and instead take

7    those words and conclude that she really doesn't care

8    about this display at all, that this is just some kind

9    of manufactured event where she has decided she wants

10   to be a Plaintiff and it's somehow -- just wants to

11   mount an Establishment Clause challenge.

12         It's a remarkable statement.  We did not find

13   any other cases where a school department has said that

14   of its student.  In fact, in most of them, standing

15   really doesn't come up at all.  And in a lot of them,

16   the Plaintiffs are Doe, John Doe, Jane Doe and their

17   children.  And as we pointed out in our reply brief, a

18   lot of that is because of the harassment that

19   individuals who identify themselves as out of the main

20   Orthodoxy as far as what the accepted religious beliefs

21   are, either because they are atheists or they are of a

22   different religious belief that's a minority in that

23   area, feel intimidation, isolation and retaliation from

24   coming forward.

25         In this case, Ms. Ahlquist testified that, yes,

1    she had said that the prayer is not offensive, and she

2    explained that she said it because she wanted to avoid

3    an escalation of the bullying and harassment that she

4    was suffering from others from having come forward and

5    opposed the prayer.

6        And not only is this a completely understandable

7    explanation, but we have provided in the answers to

8    interrogatories, in her affidavit, in the deposition

9    and in additional documents that we've submitted in

10   support of our reply, substantial evidence of the

11   various kinds of bullying and harassment and

12   intimidation that Ms. Ahlquist has been subjected to

13   since she became involved in this lawsuit and before.

14   These statements that the Defendants point to, and

15   there's only a couple of them, and we've discussed them

16   in detail in our reply brief, were in the spring of

17   2011, about the time that she was identified as a

18   person -- I think one was in March and one was in

19   April.  There may have been one in May.  This bullying

20   and intimidation predates that.

21       Not only did Ms. Ahlquist testify about it and

22   describe it in detail, pointing out that she has been

23   harassed and intimidated by her peers at school, on the

24   way home from school and in social media on the

25   Internet, we have included examples from her Facebook

1    page.  And I don't know how familiar you are with

2    Facebook, but I don't go there but --

3          THE COURT:  I've never been there.

4          MS. LABINGER:  Well, I have a Facebook identity

5    because that's the only way I get to see the photos

6    that my daughter puts on her Facebook page, but,

7    otherwise, I'm kind of a rake that goes by in the

8    night.

9          THE COURT:  My wife does that in my family.  We

10   get all the grandchildren's pictures that way.

11         MS. LABINGER:  I know.  Sometimes it's too much

12   information.

13         Apparently, on Facebook, once you allow someone

14   onto your personal Facebook page, they can engage in a

15   public discourse with you that everyone else who's a

16   friend of yours can read, and that's for a private

17   Facebook page.  There are also public Facebook pages

18   where it's just open to anybody who wants to look at

19   it.

20         There are many other forms of social media, but

21   we have provided several example pages, and this is

22   part of Exhibit 33, which I think are very poignant.

23   Ms. Ahlquist, as a young person who is used to using

24   that media and used to -- I don't even know if kids

25   talk on the phone anymore.  They mostly text and use

1    Facebook postings, but engaged in a dialogue with some

2    people who had asked to be on her Facebook page.  And

3    before she knew it, they were saying horrible, horrible

4    things about her to which she was trying to defend

5    herself until she finally realized with some prodding

6    that she needed to what they call defriend them or

7    block them and take those pages, I think she recounted

8    this in her deposition, to her school principal because

9    some of them were students in her school, and they said

10   horrible things about her and you will be able to read

11   them at Exhibit 33.  That's the kind of interaction,

12   one snapshot of it that she was facing.

13        Now, as parents, many of us tell our children

14   when they're faced with a bully, don't let the bully

15   know he's getting to you.  It will only encourage him

16   to do more.  I don't know if that's good or bad advice,

17   but I remember giving it to my kid and that's

18   essentially and exactly what Ms. Ahlquist testified she

19   was trying to do, was to soldier on and make it seem

20   like she was above it.  So there were a couple of times

21   when she said it's not offensive.  And then in those

22   same contexts, she also said, you know, the words are

23   not offensive.  They're a good motivation, speaking of

24   the message that is contained in the prayer.  But she

25   also made it clear in those same interviews that she

1    found the religious nature of it offensive to her and

2    discriminatory to her as an atheist.  And even before

3    the statements that Defendants point to as proving that

4    she was not offended and not upset by the prayer, long

5    before that, she wrote in January of 2011, and this is

6    Defendant's Exhibit 31, they put it in before we got a

7    chance to put it in, she wrote to someone else who was

8    asking her if she was thinking about joining a lawsuit

9    or becoming a Plaintiff:  "I will probably be joining

10   in as a Plaintiff for this case, but I plan to do a lot

11   of considering first as this is a big decision for me

12   and will probably result in being hated by many, many

13   people all over Cranston and, of course, religious

14   people as well.  I've already been facing quite a bit

15   of hate in school from people who clearly feel much

16   differently about the issue.  As it is, however, I have

17   always been an outcast and really have nothing to lose

18   here, so I will probably just go for it."

19          These are pretty poignant words from somebody

20   who is barely mature about recognizing what she has

21   been facing and is going to be facing and decided that

22   it was important enough to her to take the risk.  But

23   they make it clear that her concern with bullying and

24   intimidation was true and sincere and the Defendants

25   have not challenged that at all.  They just are arguing

1    to this Court, just disregard that and hold on a cold

2    record that notwithstanding her testimony to the

3    contrary that this Court should take a couple of

4    statements, one out of context, the other one they

5    didn't even examine her on it at deposition to try to

6    explore just what she meant and, you know, why she said

7    that when she did as a basis to foreclose her from

8    mounting this challenge.  And we submit that the facts

9    do not support that and this Court cannot credit those

10   statements over her statements under oath or

11   affirmation, I should say, and by affidavit and her

12   previous completely consistent statements that she made

13   statements minimizing the difference between her and

14   everyone else at times in an effort to try to deflect

15   the criticism, the hate, the bullying that was coming

16   her way so that she seemed more like she fit in.

17        That, I think, are the two main issues on

18   standing.  We believe that she clearly has --

19        THE COURT:  I have a question that nobody

20   addressed.  You stipulated that she suffered damages of

21   $25.

22        MS. LABINGER:  Yes.

23        THE COURT:  So isn't that enough to confer

24   standing in this case?  She's got $25 at stake.  It's

25   not much, but it's more than nominal damages.

1      MS. LABINGER:  Yes, your Honor.  But I do --

2      THE COURT:  That's an admission, isn't it, on

3   the other side that she suffered some harm as a result

4   of this?

5      MS. LABINGER:  I would like to say that, but I

6   believe that in the context of the parties' agreement

7   that I would not argue that the Defendants are

8   foreclosed from making their argument.  I just think

9   it's wrong, and we have established why it's wrong.

10  We've established that she has damages.  The parties

11  agreed that because no one wanted to go into delving

12  into the full extent of all of these issues and any

13  contributing factors that since the primary focus of

14  our case is injunctive and declaratory relief that we

15  would agree that if the Court finds liability, she has

16  damages.

17     THE COURT:  What do I find as liability, that

18  this is a prayer that cannot be maintained in a public

19  school, a violation of the Establishment Clause?

20     MS. LABINGER:  Correct.  And if you so find,

21  then in addition to any injunctive and declaratory

22  relief that you award, and we will be asking for that,

23  that the parties have agreed that damages are fixed at

24  $25.  And if you don't find liability, then there's no

25  damage award.  And that's what the parties agreed to.

1    So I would love to be able to say it was waived, but I

2    can't do that.

3         THE COURT: That would have been sandbagging

4    you, as well.

5         MS. LABINGER: I'm not going there, yes. The

6    one thing I can tell you about this case is that it has

7    been a pleasure to litigate on the other side with my

8    brothers, the Joes Cavanagh, and we're all in this pro

9    bono. So although I certainly hope to get attorneys

10   fees someday, but for right now that has kept us all as

11   efficient as possible and trying to work together on

12   the issues that we could agree on and respectfully

13   disagree on the issues that we could not agree on. So

14   that's where we are on that standing issue.

15        On the Establishment Clause, I sort of led with

16   that. I do believe that we have set forth in our brief

17   and our reply brief very clearly that there is a

18   religious purpose and a religious effect to this

19   prayer. It is a prayer. It is not symbols. I notice

20   the city has pointed to the Las Cruces case. It's a

21   city in New Mexico that has three crosses as a symbol

22   in their city seal and some students painted it in a

23   mural in a school. The issue with symbols, of course,

24   is they can stand for the Crucifixion. They can stand

25   for in that case, apparently, a cemetery, crosses in a

1   cemetery because there was a big cemetery there, and

2   they can be interpreted in many ways.

3        I don't know how you can interpret a prayer that

4   says it's a School Prayer, that says "Our Heavenly

5   Father," that ends with "Amen" and in the middle says

6   "Help us, grant us, teach us," which is an invocation

7   to the Divine, as anything but religious.

8        I know that the city has tried to push that all

9   to one side and say it's not religious anymore, but

10  there's nothing about this case to support that as

11  we've outlined in detail in our briefs.  It is not --

12  we've talked about the absence of calling it tradition.

13  We've talked about the fact that it is not

14  student-created art.  This is not a bulletin board

15  where just anything -- when you walk through the

16  school, there were some bulletin boards.  But most of

17  the stuff that -- everything in the auditorium, that

18  belongs to the school.  Everything in the lobby, those

19  banners that we've pointed out, also convey the message

20  of the school to its students.  These are Government

21  speech.  This is a Government prayer.  The statements

22  at the March 7, 2011 meeting, which is when the school

23  committee voted to retain the prayer and to resist any

24  litigation if it were filed, you will find not only the

25  minutes, which are very detailed, but a complete video

1    of the proceedings from start to finish, audio and

2    video that I urge the Court to review because you will

3    get the flavor of the atmosphere and environment in

4    which the school committee made its decision.  It was

5    all about religion.  It was all about saving and

6    keeping God in Cranston West.  And we have quoted from

7    many passages of the individuals, the four members of

8    the school committee who voted in favor of keeping the

9    prayer, and they all -- I'm sorry.  I can't say all,

10    but many of them referred to it as a student work of

11    art without knowing anything about the history or how

12    it was created.  That was just basically a wish and a

13    hope.  They all talked about their own religious

14    background.  And they also talked about the fact that,

15    as far as they were concerned, that the prayer contains

16    a valuable message that they subscribe to.  And that

17    makes it current, not some historical artifact that

18    just happens to be stuck on the wall.  They actually

19    re-endorsed the message that's contained in the prayer.

20         Now, they may say, well, we were only talking

21    about some of the words and not all of them, because

22    the words talk about being a good sport and doing a

23    good job.  And those are all good things.  But it's in

24    context of asking Our Heavenly Father to help us, grant

25    us, teach us how to do those things, that that's what

1    we need in order to get it done.

2         We have also submitted the declaration of

3    Reverend Dr. Donald Anderson as evidentiary support for

4    the proper understanding of the prayer.  It may be that

5    the Court doesn't need that to know that Our Heavenly

6    Father is a Christian formulation.  For those of us

7    not --

8         THE COURT:  Do you know where it comes from?

9         MS. LABINGER:  It's in our declaration.  That's

10   how I know where it comes from.  I was more amused that

11   the city was telling you about chutzpah, which I'm a

12   little bit more familiar with than the Catholic version

13   of the Lord's Prayer.

14        THE COURT:  It's in the Book of Mormon, and

15   that's an issue in this election.  In fact, there are

16   some who say that Mitt Romney is not really a

17   Christian.

18        MS. LABINGER:  We don't really want to go there.

19   We have enough on our plate, I guess, in this case,

20   right, Judge?

21        So we've submitted his declaration for further

22   evidentiary support that this is not only a prayer but

23   it is a Christian formulation of a prayer as opposed to

24   just distinguishing between religion and not religion,

25   it also distinguishes between religions.  These are all

1    things as we've cited in our brief.

2         THE COURT:  It certainly excludes the major

3    religions of the world.

4         MS. LABINGER:  It does.  And it certainly

5    excludes non-believers as the Supreme Court has

6    recognized as a big concern of the Establishment

7    Clause.  And it does so in a public school.  An

8    impressionable student, this one has formulated her own

9    views, but she feels excluded and ostracized by reading

10   the prayer and knowing that it is there and having to

11   face it when she is in the auditorium.  That confers

12   standing upon her.  The city says it's de minimis.  We

13   don't agree that it's de minimis, but we also believe

14   that the case law is clear.  You have to have enough to

15   get through the door.  You don't have a measurement if

16   it has to be a huge amount once you have enough to

17   mount an Article III case, but we believe that she does

18   have that significant amount.  This is a significant

19   issue.  It's taken a lot of courage for her to come

20   forward and continue on with this case.  I know that

21   the city will say that she is now a rock star in the

22   atheist community.  And whether that's true or not, she

23   is certainly not in her home community and in her

24   school community -- it's taken a big toll upon her and

25   it has required a lot of courage for her to come

1    forward.

2         I think I covered everything I wanted to cover

3    today.

4         THE COURT:  You almost took the hour.

5         MS. LABINGER:  I'm sorry.  Thank you very much.

6         THE COURT:  We'll take a recess between

7    arguments to give the stenographer a rest.

8         (Recess.)

9         THE COURT:  Mr. Cavanagh, you may proceed.

10        MR. CAVANAGH, JR.:  Thank you, your Honor.  Like

11   Ms. Labinger, we briefed this case extensively and I

12   want to highlight certain points for you, and I can

13   tell that you're familiar with the issues from your

14   questions.

15        Let me just start off with I do think that the

16   Van Orden case and Judge Breyer's opinion is a very

17   important opinion for this case because of the way he

18   approached the tests that the Court have used and what

19   he thought were the key factors but what he prefaced

20   all of his remarks in that opinion were was with this

21   point.  These cases are fact-intensive cases, and these

22   cases turn very much on what the facts are.  And I

23   think that's very true in this case.

24        And this case is about whether there's a secular

25   purpose in this mural on the wall at this time or

1    whether there's a religious purpose that's

2    impermissible under the Constitution.  And the focus on

3    that would be the facts and circumstances that would

4    allow the Court to apply the various tests under those

5    circumstances.

6         Just to backtrack for a second on the facts,

7    Cranston West High School really probably would be an

8    example of many high schools in this country,

9    post-World War II baby boomer kids, Eisenhower era,

10   apple pie, flag, a different way of life.  Back in

11   those days, they had School Prayer.  Back in those

12   days, they did the Our Father and no one thought twice

13   of it.  That's the way it was.

14        THE COURT:  I lived that.

15        MR. CAVANAGH, JR.:  Right.  So did I, your

16   Honor.

17        THE COURT:  But the amazing thing was when we

18   said the School Prayer and the Our Father in English, I

19   really didn't understand it.  My religious education

20   was entirely in French and French Dominican priests, so

21   whenever it was recited in the classroom, I didn't

22   recite it because I didn't know it in English.

23        MR. CAVANAGH, JR.:  Well --

24        THE COURT:  That makes me a little different

25   than everybody else.

1       MR. CAVANAGH, JR.:  Right.  Well, I was thinking

2    about in our brief we argued that over the Rhode Island

3    Supreme Court we have the phrase "Not under man, but

4    under God and law," but it's in Latin.  So it may be

5    because it's in Latin no one's ever challenged it.

6    Although I don't know how it escaped Alan Berberian

7    over all these years, but apparently it did, your

8    Honor.

9       But going back to this time when this new high

10    school, if you will, in competition with its big

11    brother, Cranston East, they were transferring kids in.

12    The testimony in the record are that some kids didn't

13    even want to go to Cranston West; they wanted to go to

14    Cranston East.  One of the big problems at that high

15    school was to develop tradition and develop something

16    that the kids could identify with.

17       So very early on various students went about

18    trying to come up with traditions in the school that

19    were important.  And the record demonstrates that not

20    only did they pick school colors, the name of the

21    school newspaper, the mascot, but they came up with a

22    creed and a prayer.

23       And David Bradley is a witness.  You see there's

24    an Internet tape of his.  He testified before the

25    school committee, and he gave a deposition.  He was the

1    student who wrote the prayer mural that is now being

2    challenged in this case.  He wrote that in 1960.  It

3    was approved by the school council and, as Ms. Labinger

4    said, it was recited over the loud speaker in the

5    school, and he proudly remembers that.

6         He also remembers that they stopped reading the

7    prayer.  He didn't know why at the time.  He speculated

8    that it was because in 1962 the Supreme Court decided

9    the Engel case, which was that a prayer mandated by the

10   State of New York was prohibited by the Constitution

11   and that stopped that type of prayer in the school back

12   at that time, recitation forcibly, if you will.  They

13   stopped that.

14        He also recalled that the class of 1963, the

15   first graduating class gave as a class gift the creed

16   and the prayer that he had written.  And they were

17   given by that class.

18        The vice-president of the class testified that

19   the class paid for it themselves.  It was their idea.

20   They commissioned an artist who was the same artist who

21   didn't work for the school department but who had done

22   some artistry at Bane because Mr. Zito remembered when

23   he was at Bane that they had over the science classes

24   murals of dinosaurs and different scientific things

25   that were very attractive, and they decided that they'd

1    try to get this man to do that, and that's what he

2    testified to.  That's how that came to be on the wall

3    in that form.  They did that.

4         I just want to make clear because I think it was

5    a little confusing the way it was described is

6    Mr. Bradley did testify that he wrote the creed and the

7    prayer.  I think if you look at the Bane Creed and the

8    Cranston West Creed, they're almost the same.  So it

9    looks as though he may have copied that.  The prayer,

10   however, is different.  There's no indication that that

11   was not a student-created prayer by Mr. Bradley.  No

12   question about that, that that's what that was.

13        He tried to do it in a way that he thought would

14   be inclusive at that time, and he wrote up aspirations

15   that I suppose we'd all agree to, do your best, grow

16   mentally, morally, physically, be kind to people,

17   classmates, teammates, be a good sport, et cetera,

18   values of friendship and be a credit to Cranston West.

19        And in those times, it was legal to say "Our

20   Heavenly Father" or to say "Amen."  And that's what

21   they did, and that was part of the heritage of the

22   school in the 1960's.  That's how he wrote the prayer

23   and that's what people said.  They have the school

24   colors.  They have the school mascot.  They all have

25   all of those things.  So that's the history of this.

1    And it's really a kind of an innocent --

2            THE COURT:  How does that save it under the

3    Constitution, the First Amendment?

4            MR. CAVANAGH, JR.:  I think it saves it because

5    it isn't a prayer that's been forced upon anybody.

6    It's a statement of the old way the school was, just as

7    we have "In God We Trust," that's the way we used to do

8    it.  It's a tradition in our country.  The Declaration

9    of Independence has references to God, because it was

10   in history.  That's the way it was in history.

11           The question in this case with this particular

12   mural on the wall now is does it have an ostensibly

13   predominant religious purpose?  Is that why it's there

14   and is that its effect?  And under the circumstances of

15   this case, the history I just gave to you is this is

16   not a case like _Stone_, which the other side thinks it's

17   their best case where the Kentucky legislature in the

18   1980's passed a statute that mandated that if you had

19   private funding you had to put the Ten Commandments in

20   every classroom, and the Court found that to be a sham.

21           The Court found that to be having an underlying

22   predominant religious motive, and it was being done, if

23   you will, injected into the scenario of the '80's into

24   the school system, if you will, almost a reaction

25   against what some would say were misguided

1    interpretations of the Establishment Clause up to that

2    point.  In other words, the Government decided we're

3    going to do something and push that ahead.

4         Our case grew up with none of that.  Our case

5    grew up just like the Declaration of Independence, just

6    like "In God We Trust."  It was innocent.  It came out

7    of the fabric of the community and the school and wound

8    up on the wall of the school as a gift of the first

9    graduating class, not to be put up on there to force

10   prayer in people or anything, but because this class at

11   that time put it up.  And it wasn't illegal at that

12   time to put something like that up.  No one had

13   declared that.  Engel was forced coerced recitation of

14   a state-created prayer.  That's what Engel was in 1962.

15   We didn't have all of the nuances that we seem to have

16   had today as this made its way, the Establishment

17   Clause, to where it is today.

18        So the history of this is important because of

19   how it came up.  The Government's motive certainly back

20   then and the way the students did this had nothing to

21   do with any forcing religion on anyone.  This is simply

22   this is one of our traditions.  The 1964 class put up

23   the bronze Falcon, which was their mascot.  The other

24   classes, as you saw, have given other gifts.  The first

25   class there at the time that the creed and the prayer

1     were made a part of fabric of that community put it up

2     on the wall.

3             So that's the history issue that I think is

4     important because it's different than injecting or

5     infusing or doing a latter day run around the law to

6     try to sneak it into a school.  That's what the Court

7     in Stone didn't like.  That's what they didn't like in

8     McCreary either because someone decided very relatively

9     recently to put the Ten Commandments in the foyer of

10    the courtroom to see what that does.  No one did that

11    in this case.  This grew up just like we have many,

12    many references to religion in our society by history

13    because it was true.  That's the way it was.  It wasn't

14    put there for a purpose.  Wasn't put there to deliver.

15    It was put there because this was a gift and it was

16    part of the tradition.  Then we learned what happened

17    to that afterwards.  There's absolutely no question

18    that decade after decade has gone by, and they've never

19    recited the prayer at Cranston West.  It is never used

20    for a religious purpose at all.  The testimony is

21    undisputed that when it was first given at a ceremony,

22    there was no religious ceremony and it wasn't recited.

23    The only conflict on that issue is that, as

24    Ms. Labinger said, this one teacher who later was a

25    principal who thinks he remembers in the early '60's,

1    right -- '64, he was a teacher there from '64 to '72,

2    he thought he remembered that they might have recited

3    the prayer.  He thought maybe the creed, too.  He

4    wasn't sure.  Mr. Zito said that when he was there they

5    never did that.

6          More importantly, Mr. Bradley, who wrote the

7    prayer said when he graduated in 1965, so he was there

8    for a couple of years after it was on the wall, said,

9    They never recited my prayer ever again after they

10   stopped doing it in 1962.  That was his recollection.

11   And it's also undisputed that in the '70's, in the

12   '80's, in the '90's, the first part of this century,

13   the first decade, no prayer.  No question while this

14   Plaintiff was a student at Cranston West, no prayer, no

15   reference to the prayer, no highlighting of the prayer,

16   nothing to do with the prayer under those

17   circumstances.  It's just there, a mural on the wall

18   with other banners of the tradition of the school that

19   have been added over the years throughout, not only in

20   the auditorium but throughout the school.  Different

21   traditions, if you will, that were very important.

22         So that what we have is this got up on the wall

23   because it was a gift and because it was part of the

24   history of the school with no other purpose, no

25   religious motive whatsoever as evidenced by the fact

1    that it's never been used for a religious purpose.

2    Now, there are religious words.  There are religious

3    words in that.  And the question, I think, for the

4    Court is, is it impermissible under our way of life,

5    under our Constitution to have some religious words in

6    a context in a public school, a high school, or is it

7    absolutely illegal because there's a reference to a

8    prayer and a reference to a God.

9         THE COURT:  Well, if you referenced the entreaty

10   that was to the Great Buddha, what do you think then?

11        MR. CAVANAGH, JR.:  If the Great Buddha in those

12   -- and that's what the people in the 1950's and '60's

13   had made as their prayer and it had been given as a

14   gift of the school and it grew up like that and it was

15   just kind of a keepsake, if you will, of the early

16   traditions of the school, that would be fine.  What

17   would be wrong with that?  Because it's really a

18   secular purpose.  It's a secular purpose that it's up

19   there for now.

20        And that gets me to the school committee of

21   2011.  What did they do?  All they did was say we're

22   not going to erase history.  This is the history of the

23   school.  That's the way it is.  We don't think the

24   Constitution means we have to take that down because

25   there's some religious reference.

1    In the Hanover case, the Freedom case, the First

2    Circuit said, I think very appropriately, it takes more

3    than the presence of religious content to have the

4    effect of advancing religion, let alone to do so as a

5    primary effect.  Really, that really is what we have

6    here.  There is religious content.  And in Van Orden,

7    Judge Breyer and other judges recognized the Ten

8    Commandments are religious content.  They're lifted

9    wholesale from sacred scripture.  That's religious

10   content as opposed to Mr. Bradley created a teenage kid

11   who did his best on his own prayer.  This is lifted

12   from sacred scripture.  It's on the Capitol grounds in

13   Texas, and the question is, is this permissible.  And

14   the Court said it has a religious message but that's

15   not the predominant message.  It's in a secular

16   setting.  It's not used for religious purposes.

17   There's no meditative setting for that.  There's no

18   evidence that it was ever used for religious purposes.

19   Isn't that on all fours with our case?  It's never been

20   used for religious purposes since it's been up on the

21   wall.  It's obviously not a meditative thing.  In fact,

22   you can't even see it from most places in that

23   auditorium.  And you certainly have to be very close to

24   it to be able to even see what it says.  You've got to

25   be in one quadrant of that auditorium to see that.

1          THE COURT:  I can't test that because the

2     lighting was so bad.

3          MR. CAVANAGH, JR.:  Well, that's the way the

4     lighting was.  You know, I looked around the

5     auditorium, and I noticed that there were a whole host

6     of lights up in the wall that didn't have any light

7     bulbs.  I know it costs a lot of money to bring in

8     things to put that up.  I thought they did that to

9     prove that they couldn't pay my legal fees, but she

10    thought they did it to make it dark.  But in any event,

11    it's expensive to do that.  My understanding is that

12    when finally the lights get so dark they spend the

13    money to erect everything to have to go up and do all

14    of that, and that's the way it is.

15          My point is, your Honor, even if the lights were

16    on, it's not forced upon anybody.  It's a historical

17    document just like the rest of these things as the

18    tradition of the school.  And I think that's really

19    important in it because in Van Orden, you have the Ten

20    Commandments, religious content, some religious

21    message, but the predominant message is secular.  What

22    is the message in that auditorium, a religious foisting

23    or a Government sponsor of religion?  It is just

24    history.  And actually, the school committee -- I don't

25    know where we got the idea that it was whim and fancy

1     on March 7th that they dreamed up that it was a

2     student-created prayer.  Mr. Bradley testified that he

3     did the prayer.  Those were the facts.  That was

4     student-created.  What it didn't have on it was it

5     didn't have any notation of that, and it didn't have

6     the notation that it was a class gift.  It did

7     originally, according to Mr. Zito, the vice-president,

8     he said that there was -- he remembers that it recorded

9     that in some way explained that it was a class gift.

10          And as you saw in the view, there was a place

11    there, Mr. Zito testified in his deposition when he

12    went there this summer and looked at this in

13    preparation for his deposition, he saw that same place

14    and he said that's where that was.  And in the record,

15    the best understanding of that is that was painted

16    about 10 or 15 years ago and inadvertently or

17    negligently was painted over.  So that there's no

18    attribution, if you will, that it was a gift of the

19    Class of '63.  And in fact, it would probably be better

20    if that was the case.

21          We mentioned in our brief that the school

22    committee not only voted to not erase the wall but to

23    put an explanatory plaque up, but because we're in

24    litigation, we didn't do that; but I think that would

25    be better to do that and explain that.

1          The point, your Honor, is this is a secular

2     setting.  This is not a religious setting, and that's

3     the key issue.  And Judge Breyer in Van Orden went

4     through all of those factors.  And Van Orden is

5     remarkably close to this except this mural has been on

6     the wall longer, and no complaints, which he thought

7     was determinative in Van Orden, the fact that it was

8     there for so long and no one complained until now.  He

9     thought that was a key factor.

10         He also thought that a key factor here was to

11    avoid divisiveness, to avoid -- the Establishment

12    Clause was not supposed to cause divisiveness.  One

13    looks at that and we say -- what I'm saying is I

14    suggest that even though this is a public school, and

15    the First Circuit dealt with that, the pledge of

16    allegiance was a public school.  It's just a factor

17    courts are more vigilant for obvious reasons.  I would

18    be more vigilant in kindergarten than I would in

19    grammar school and junior high.  High school, college,

20    I mean, it comes a point in today's world the level of

21    sophistication that kids have.

22         So the point is that's a factor in these cases.

23    I'm not denying that.  But it isn't a distinguishing

24    factor given these facts, the way this came up, and the

25    way this isn't in your face.

1      This Plaintiff testified that in two years she

2   had been in the auditorium eight to ten times.  Now,

3   this isn't in a classroom every day.  This isn't

4   referred to.  This isn't recited.  This isn't voluntary

5   recitation.  There's no participatory ceremony at all.

6   It's a passive secular display, part of the history of

7   the school.  It has some religious words in it, but

8   there's breathing room.  There has to be under the

9   Establishment Clause because, otherwise, it's hostility

10  towards religion.  It's rip it out.  Where do we start?

11  In God we trust, why don't we do that?  Under God and

12  man, why would we have that?  That's a reference.

13  Where do we stop this?  The Court has borderline cases.

14  The Court dealt with borderline cases.  <u>Van Orden</u> was a

15  borderline case.

16      I urge the Court that just because it's in a

17  public school doesn't mean, oh, we have -- and it says

18  prayer -- all of those prayer cases, <u>Stone</u> an

19  exception, the others are exercises, recitation,

20  participation, praying, using it for religious

21  purposes.  This is nothing like that.  This is an

22  historical timepiece.  And the record is that's how it

23  evolved.  We didn't just push it in to sneak it by.  We

24  didn't put it in anybody's face.  There's breathing

25  room for this.  There's breathing room under these

1    circumstances.

2              There's probably more I should say.  Standing.

3    Why do we raise standing?  Because we have a remarkable

4    situation that you don't normally have.  We have a

5    series of absolutely inconsistent statements by an

6    intelligent person that fly in the face of the standing

7    requirements under law by her repeated statements that

8    the words weren't offensive.  It was the people who

9    insist that it can stay on the wall that irritated her

10   and got her upset.  That's what she said.  Now, if

11   that's not standing, that's not offended-observer

12   standing, that's make-a-point standing, that it's

13   illegal standing but not an injury-in-fact standing.

14             Now, the explanation, of course, is:  I want to

15   tone it down.  I didn't want -- so instead of saying

16   that the words were offensive, in order to tone it down

17   so that people wouldn't harass and bully, I said it's

18   the people who get me mad.  They're the ones who

19   offend.

20             Now, that really doesn't make any sense, and it

21   suggests kind of an afterthought as to, whoa, I have a

22   standing problem.  (Reading:)  But what I have said on

23   many occasions is, honestly, I know the prayer is not

24   offensive.  That's not the problem.  I think that

25   religion is counter-productive and has absolutely no

1    place in public schools.  Yeah, I'm not offended by it,

2    but you can't violate the Constitution.  The prayer

3    isn't offensive.  The message it gives is positive.  It

4    is supposed to be something that encourages kids, so,

5    no, it's not really offensive.  What is offensive is

6    that people are so adamant about keeping it.

7         That's a classic example of non-standing, and

8    those are the cases the courts have said you can't go

9    around finding constitutional violations and getting

10   advisory opinions from courts.

11        Now, they claim that we're attacking her for

12   doing that.  No, we're not.  We're just saying this is

13   what she said, and we don't normally have admissions of

14   that kind.  But in a way, it ties in, it ties in, her

15   very first -- she didn't notice it.  She was in the

16   auditorium all through her freshman year on a number of

17   occasions and didn't even know it was there.  When

18   someone pointed it out to her, she said, I forgot about

19   it.  It wasn't really the first thing on my mind.  And

20   then over the summer I heard about an adult complained,

21   heard about the ACLU involvement and then got involved

22   and then got solicited by the ACLU and she's a

23   Plaintiff.  So that's what it is.

24        Why do I raise that?  Because I think this is an

25   obscure not-in-your-face mural on the wall.  This isn't

1    in a classroom every day.  No one recites it.  No one

2    refers to it.  No one does anything with it.  And what

3    this case represents is just because it has some magic

4    words that someone thinks are just prohibited, they

5    should be pulled out.  And I'm saying that this isn't

6    what <u>Van Orden</u> is about.  This isn't what the

7    Establishment Clause is about.  It will be divisive.

8    It doesn't make sense.  The history shows no one was

9    upset with this, no complaints.

10            Judge Breyer had it right.  You can look at all

11    these tests, you can apply <u>Lemon</u>, you can do the

12    coercion, you can do all of that, but it's legal

13    judgment.  And you're good at that.  Legal judgment on

14    these facts.  And this case is not a case that is

15    Government advancing of religion, Government favoring

16    religion, Government forcing religion on anybody.  It's

17    a historical timepiece.  It's got a secular purpose now

18    and always did have a secular purpose from the time it

19    went up.  The people who did it then were innocent.

20    The people now who voted on not to take it down are

21    just saying we don't believe that our Constitution

22    requires us to erase history.  Thank you.

23            THE COURT:  Thank you.

24            Any rebuttal?

25            MS. LABINGER:  Very brief.  I will be brief this

1    time.

2              THE COURT:  All right.

3              MS. LABINGER:  I mentioned that Justice Breyer

4    gave the supporting vote in <u>Van Orden</u>.  He also --

5              THE COURT:  Why all this emphasis on Justice

6    Breyer?  Otherwise, it would have been four, four?

7              MS. LABINGER:  Yeah.  So that the rule is

8    whoever has the -- he tipped the scale over to

9    rejecting the Establishment Clause claim, which gave

10   five votes to the monument staying; and then under

11   Supreme Court precedent, you look to the least

12   expansive ruling that resolves the case, which makes

13   his the determinative factor.  The very same day, as I

14   mentioned before, he went with the four dissenters in

15   <u>Van Orden</u> to make a five-person majority in <u>McCreary</u>.

16             He made clear in <u>Van Orden</u> that he thought that

17   the <u>Lemon</u> test wasn't particularly helpful in that very

18   borderline case, and he specifically excluded from the

19   category of difficult borderline cases, which is where

20   he put this passive display, religious displays, not

21   recitation of prayers, but religious displays on the

22   grounds of a public school where, given the

23   impressionability of the young, Government must

24   exercise care in separating church and state.  We talk

25   about this in both our opening brief and our reply.

1            As I said before, I don't believe that you can

2       equate, and I don't think the First Circuit did in the

3       **Freedom From Religion Foundation** case, the words "Under

4       God" in the pledge of allegiance, which is a patriotic

5       statement.

6            THE COURT:  Which came into the pledge during

7       World War II.

8            MS. LABINGER:  Yes.  I understand it was

9       actually an anti-Communist thing to try to distinguish

10      the -- that's what I understood it was, that it had to

11      do with distinguishing the United States from Communist

12      countries where religion was prohibited.

13           But that is not what we have here.  We have a

14      prayer.  It is not an independent document.  It's not a

15      Government document declaring independence of the

16      Colonies from the King of England where they happened

17      to make reference to the endowed by their creator, but

18      what they're really talking about in that case is we're

19      disaffiliating from the King of England.

20           This is a prayer.  It is styled as a prayer.  It

21      has no other purpose except to be a prayer.  I think

22      that the city reliance on Van Orden is just really

23      putting too much reliance on the one case that -- and

24      the Court was willing on a very split, fragmented

25      decision to uphold a passive display in a big park.

1    And I think that the reference that Mr. Cavanagh made

2    to divisiveness was an acknowledgment by Justice Breyer

3    that there were about a hundred of these monuments

4    scattered throughout the country that had all been

5    donated by the Fraternal Order of Eagles and that that

6    would create some divisiveness or issues if they

7    declared that they could not stand.  That's not our

8    issue here.

9         And the proof of that, in some respects, is what

10   the city did at Bane, which we don't know why they did

11   what they did at Bane.  It was suggested that we were

12   complaining that they remove the prayer.  That's not

13   true.  We're not complaining that they remove the

14   prayer.  We're just puzzled, and we were unable to get

15   an answer and other than on advice of counsel we're not

16   going to tell you anything more as you will see from

17   the 30(b)(6) deposition of Mr. Lombardi.  We pressed as

18   many ways as we could.  Don't understand why the creed

19   was taken down.  It's an innocuous document but it

20   went, too.

21        The fact that a student composed the prayer does

22   not make a paid-for professional sign created by

23   someone hired by the Class of 1963 a student-created

24   work of art.  They're mixing apples with oranges.  It's

25   not a student-created work of art.  It certainly is a

1    gift from a class accepted by the city.  It's become

2    Government speech.  And I will not go back through my

3    argument again.

4            I thank you so much for your patience today.

5            Thank you.

6            THE COURT:  All right.  Thank you both for very

7    excellent arguments.  I will take this matter under

8    advisement and write another opinion in my old age.

9            (Court concluded at 5:00 p.m.)

<u>C E R T I F I C A T I O N</u>

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/ Anne M. Clayton

————————————————————————————————————————
Anne M. Clayton, RPR




March 21, 2012

————————————————————————————————————————
Date